THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL F. HAGAN, Defendant-Appellant.

Second District   No. 2—89—0850

Opinion filed June 5, 1990.—Supplemental opinion filed on denial of rehearing July 30, 1990.

268

Harlovic & Perko, of West Dundee (Phyllis J. Perko, of counsel), for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Following a bench trial, the defendant, Michael F. Hagan, was found guilty of the offenses of forgery and attempted theft by deception. The trial court sentenced the defendant to a four-year term of imprisonment on each offense, the sentences to run concurrently. Defendant appeals, raising the following issues: whether the offense of attempted theft by deception was proved beyond a reasonable doubt; whether the offense of forgery was proved beyond a reasonable doubt; whether defendant was prejudiced by the admission of improper evidence; and whether convictions of both forgery and attempted theft by deception were proper. We affirm in part and reverse in part.

Defendant was originally charged in a multicount indictment. The State elected to try the defendant only on count X (forgery) and count XII (attempted theft by deception). Count X provided in pertinent part as follows:

"Michael Hagen [sic] on or about February 7, 1989, in the County of Lake and State of Illinois, aforesaid committed the offense of FORGERY in that the said defendant with the intent to defraud knowingly delivered to Michael Flynn, a document, to wit: a letter from the First Midwest Bank of Lake County, apparently capable of defrauding another, in that it was purported to have been made by Laura M. Jones, a personal banker on January 27, 1989, knowing said document to have been altered so as to misrepresent the defendant's financial bank balances in a money market account and a checking account."

Count XII provided in pertinent part as follows:

"MICHAEL HAGEN [sic] on or about February 1, 1989 to February 10, 1989 in the County of Lake and State of Illinois, aforesaid committed the offense of ATTEMPT THEFT OVER $100,000.00 in that the said defendant with the intent to commit the offense of Theft in excess of $100,000.00 *** performed a substantial step toward the commission of that offense in that he, without lawful authority, represented to Michael Flynn and Hiffman, Shaffer and Anderson, Incorporated, that Hagan Corporation had an income of $2,915,134.00 in 1986, $3,433,334.00 in 1987, by delivering written documents

to the aforesaid parties during lease negotiations in an attempt to obtain property, to wit: free rent, valued at more than $100,000.00.''

We have summarized the testimony at trial as follows.

Michael Flynn testified for the State that he is vice-president of leasing of Hiffman, Shaffer and Anderson (HSA), a commercial corporate real estate firm. HSA was the listing broker for a building at 1300 Woodfield Road in Schaumburg, Illinois. In February 1989, Flynn received a telephone call from an agent with respect to leasing space in that building. A short while later, he received a telephone call from the defendant, who was the prospective tenant. On or about February 3, 1989, Flynn met with the defendant at the management office located in the 1300 building. Defendant informed Flynn that he needed approximately 12,000 square feet of space. Flynn gave defendant a tour of the building. Defendant informed Flynn that he needed the space to house a legal services firm and ancillary administrative needs. He did not indicate how many employees he had. According to Flynn, defendant was well versed in his needs because he had been unable to finalize a deal for other space due to the other building going bankrupt, and he was unable to occupy the premises. Defendant also told Flynn that he had assisted his previous landlord with renting his space, so that he was basically ''on the street.'' While observing the space Flynn was showing him, the two discussed specifications and requirements defendant had for the construction of his space. Of foremost importance to the defendant was how soon he could complete the transaction so as not to lose money. According to Flynn, closing a real estate transaction of this type could take as long as a year but usually could be done comfortably in six months.

Flynn testified that he informed the defendant that their typical lease rate was $15.20 per square foot on a net basis plus tax and operating expenses. The gross rate would be $23 or $24 per square foot, which would be $24,000 per month. Defendant insisted on a 10-year lease.

A day or two later, Flynn again met with the defendant at the management office. Defendant informed Flynn that as part of the deal, defendant's broker, Lowell Stone, was to be paid his full commission at the time of closing. Typically, half of the commission is paid within 30 days of the signing of the lease, and the other half is to be paid either upon occupancy or upon payment of the first month's rent.

Flynn and the defendant also discussed the details of defendant's prior lease. Defendant told Flynn that he had been a tenant of Boehm

Property Management for 10 or 12 years. His monthly payments were $15,000 to $19,000. He leased approximately 15,000 square feet of space. Defendant provided Flynn with Boehm's telephone number and identified Louis Fazio as the person to whom Flynn should speak. Flynn contacted Louis Fazio by telephone to confirm the relationship with the defendant and requested written confirmation. According to a letter sent by Fazio to Flynn dated February 8, 1989, Boehm had had a good relationship with the Hagan Company and that, according to its records, defendant's company had leased space at approximately $19,120 for the previous five years.

On February 7, 1989, Flynn received a letter via fax. The letter bore the letterhead of First Midwest Bank of Mundelein. He telephoned the bank and spoke to Laura Jones, a personal banker. He informed her that he wanted to verify the authenticity of the letter that he had received. After his conversation with Ms. Jones, he faxed her a copy of the letter.

On February 9, 1989, Flynn met with the defendant and the building space planner, Eugene Marzelli. As they were discussing the project, defendant increased his space requirement from 12,000 to 15,000 square feet. Defendant indicated to Flynn that he would be needing space for approximately 70 employees. Defendant told Flynn he presently had 35 employees in telemarketing and 15 in marketing, with a potential of 70. Flynn asked to see defendant's previous floor plan arrangement, but defendant never produced it for him. When Flynn requested additional financial information, defendant provided him with tax returns which in Flynn's words were "sloppy for a firm of his magnitude." Defendant explained that his accounting was "in house." The 1986 tax return showed a taxable income of $2,915,134, and the 1987 taxable income was $3,334,000.

According to Flynn, the parties were hoping to draw up the lease and complete the plans within the following 10 days. The parties reviewed a blank lease form, and defendant noted items that would not be acceptable to him. The parties discussed a free rental period of three years. They only discussed the actual monthly rental fee in round terms because the square footage had not yet been determined, about $20,000 to $25,000 net rent. Thereafter, they discussed the brokerage fee, which would have been about $70,000.

Flynn further testified that defendant told him that he lived in Lake Forest; that he had grown up in Kenilworth; and that he had attended law school. He also told Flynn he had been in business 17 years.

On cross-examination, Flynn testified that a free rental period is

standard in the rental of office space. Flynn stated that occasionally a tenant will leave at the end of its free rental period but that the tenant would then probably be sued. Flynn also admitted that, on occasion, a prospective tenant will exaggerate his financial position to some extent, until verification is sought. Flynn's notes reflected that at one point the negotiations included the defendant paying one-half a month's rent upon the execution of the lease and the other half on his occupying 12,000 square feet.

Flynn testified that some preparation had been made towards drawing up the lease on the terms discussed when he determined that he would not meet with defendant further or sign the lease. Flynn felt he needed to do more "research" before he would enter into the deal with the defendant. He advised his management group to hold off until he was able to confirm some of the information he had been given.

Flynn further testified that it was unusual for the broker to be paid the full commission upon the signing of the lease. He informed the defendant that it would be difficult to have the broker's check at the time of the signing but he would have it a few days after the signing, to which defendant agreed. Flynn admitted that the check was not going to be made out to the defendant. Flynn also stated that the reason the number of employees the defendant had was important was in order to insure that the building was not too populated.

Julie Murphy testified that she is an employee of Mail Boxes, Etc., located in Vernon Hills, Illinois. Her records show that on February 7, 1989, defendant came in to send a document via their facsimile (fax) machine. Ms. Murphy explained that when a document is sent by fax, the customer fills out a cover sheet with the name of the sender which is sent along with the document faxed. She identified the letter from First Midwest Bank signed by Laura Jones and indicated that certain account balances were on the document defendant faxed on that date.

On cross-examination, Ms. Murphy testified that the customer keeps the original document, unless the line is busy. She sometimes reads the documents that are faxed, but she did not recall if she read this particular letter. She knows if a document was faxed from a location because the information as to the time, place, and date of sending is at the top of the document faxed, as well as on the cover sheet. Ms. Murphy testified that she would not necessarily remember on her own whether someone sent a fax on a particular date. She told the detectives that she did not recognize defendant's name, but, when shown his picture, she told them the defendant had been a customer.

She admitted that she could not say for sure whether defendant had come in on February 6 or 7; only by means of the date on the fax did she determine he had been in there on the 7th. She also admitted that anyone could have filled out the cover sheet using the defendant's name, but she felt it unlikely since she remembered him coming in.

Laura Jones testified that she is an employee of the First Midwest Bank of Mundelein banking center. On January 27, 1989, defendant contacted her and asked her to prepare a letter stating his accounts and their balances. She informed him that the average balance for those accounts was either negative or very low. Defendant then instructed her to put in the letter when the account was opened and the account number. She then gave the copy of the letter to the defendant, keeping a copy for her records. She also advised him that his accounts were having problems and attached a letter showing the status of his accounts.

Ms. Jones testified further that on February 13, 1989, she was contacted by Michael Flynn, who was seeking information about the defendant's accounts. When Ms. Jones informed him that she could not give out that information, he asked that if he faxed her a letter, would she verify that she had sent it.

According to Ms. Jones, the letter she received from Flynn was not the same as the one she prepared for defendant, since it reflected account balances.

The State introduced the testimony of Mary Riley, Brian Zatz, Louis Caravelli, and Steven D'Andrea. Riley, Zatz, and D'Andrea are all leasing agents for office buildings in the Chicagoland area and testified to their dealings with the defendant in his efforts to lease office space. Caravelli is the representative of the owner of the building that Zatz was the leasing agent for. The leasing agents all testified as to defendant's requirements for a large amount of space (between 15,000 and 20,000 square feet), a long-term lease, free rental period and that his real estate broker be paid in full upon the signing of the lease, not a typical request. All three testified that they were told by the defendant that his company had been located in Kenosha. Ms. Riley was told by the defendant that he lived in Lake Forest and that his children attended Country Day School in Lake Forest. D'Andrea was also told by the defendant that he lived in Lake Forest and that he had around 100 employees. Caravelli testified that he was present when the defendant refused to furnish a client list.

On cross-examination, Riley, Zatz, and D'Andrea all testified that it was quite common for a prospective tenant to request and receive a period of "free rent" for entering into a lease for office space.

The parties stipulated that defendant's children never attended the Country Day School in Lake Forest. Both James Mackey and Charles Thomsen testified that they had worked with the defendant for a company called Amerigroup when the offices were located at 175 Hawthorne Parkway, Suite 325, in Vernon Hills, Illinois. According to Mackey, the office occupied 6,000 square feet, and there were four employees. Mackey worked there from 1986 to August 1988. The company was dissolved for failure to pay fees. After the company moved out in the fall of 1988, Thomsen continued to work for the defendant but had to conduct business out of his car.

James J. Penney testified that he was a tenant in the Hawthorne Parkway building at the same time as the defendant. He testified that defendant had three or four employees but that he had never taken a "head count." On cross-examination, Penney testified to heating and air conditioning problems in the Hawthorne Parkway building.

Sybil Fagin testified that she is the director of operations for Turner Development Corporation. Turner builds commercial real estate office buildings and leases and manages them. One of the properties she oversees is a building located at 175 East Hawthorne Parkway in Vernon Hills, Illinois. She became responsible for that building in January 1988. She met the defendant in March 1988. Defendant's lease with Turner was for five years at $18.50 per square foot with 18 months' free rent. The lease began on November 1, 1986, and the first scheduled monthly payment was May 1, 1988. At the time Ms. Fagin met the defendant, he made no complaint about the building.

Ms. Fagin further testified that she visited defendant's office suite on occasion, but she never saw any more than two other persons in the office, although the 6,000-square-foot space could have accommodated more. Ms. Fagin did inquire of defendant if he was comfortable in his suite. Defendant told her he was aware that there were problems in other parts of the building but that his suite was comfortable.

According to the witness, she became concerned over defendant's solvency and requested reports on his corporation from Dunn and Bradstreet. She also contacted her company's local counsel. When the defendant did not make the May 1, 1988, rental payment, a meeting was set up between Ms. Fagin, Frank Friedman, attorney for Turner, and defendant. Defendant informed Ms. Fagin and Friedman that he did not intend to pay the rent, and, if pursued, he would file a countersuit on the basis that the building was not maintained carefully and had problems. Defendant had never previously to this made complaints about the building. A settlement was negotiated with the defendant, and the lease was terminated. Defendant vacated the

premises at the end of August 1988. Defendant never made any payments on the lease; however, he was paid $8,696.37 to enter into the lease.

On cross-examination, Ms. Fagin admitted that she was not present at the time the lease with defendant was negotiated. She did not know whether the reason the defendant received $8,696.37 from Turner was because he could not move into the space on the date agreed upon, but it could have been. According to Ms. Fagin, the problems with the heating and air conditioning were limited to an isolated area of the building and that there were only three complaints about the problem, although she admitted that the building had only one heating and air conditioning unit. She was aware that there is pending litigation with another tenant on the heating and air conditioning problems. She admitted that she had instructed Mr. Friedman to have the defendant vacate the building as soon as possible and approved of the settlement which entitled defendant to an additional three months. She never complained to the police about the defendant.

Ms. Fagin further admitted that it was a common practice to give free rent at the beginning of such leases and that it was impossible to determine what would happen at the end of the free rental period. The witness had no knowledge of defendant's financial situation at the time he entered into the lease. She did not recall being told by Matt Covey, the building engineer, that there were problems with defendant's suite unless it was a problem that lasted only for a day or so.

Daniel Colin testified that he is a sheriff's deputy with the investigation division of Lake County sheriff's department, and he worked on the investigation of the defendant.

In the course of his investigation, he found that the defendant resided in Vernon Hills. Also in the course of his investigation, he served a subpoena on the First Midwest Bank of Mundelein for bank records of the Hagan Corporation. He also subpoenaed the corporation's records from three other banks, but all the accounts were closed. He also obtained a letter from the Boehm Management. Upon checking the address on the letter, he discovered it was a residence with no business being conducted there. He also found that there was no such name with a 10 West Bend in Vernon Hills.

On cross-examination, Detective Colin testified that when he went to the address on the Boehm letter, he did not go inside or talk to anyone on the premises because no one was there. He did observe children's toys in the yard. Colin acknowledged that the residence

could have contained an office. He did not check any other banks to see if defendant had any other accounts.

After defendant's motion for a directed finding was denied, he presented the following evidence.

Matthew Covey testified that he is a licensed stationary engineer. He operates the physical plant of buildings, overseeing the air conditioning, heating, and mechanical system in the buildings. Between June 1986 and October 1988, he was employed by Coldwell Banker at the building located at 175 East Hawthorne Parkway in Vernon Hills, Illinois. He was responsible for maintaining and operating the heating and air conditioning system in that building. In 1987 and 1988, there were complaints from all over the building about the heating and air conditioning. The crux of the problem was poor air flow due to undersized duct work which prevented the delivery of the proper amount of air to some spaces. The problems were worse in the summer than in the winter. Covey did receive complaints from the defendant and, upon checking, found the temperature in defendant's office suite to be uncomfortable on occasions. Other tenants also made similar complaints. Covey reported the complaints to Floyd Coats, the building manager. Complaints were also forwarded to Sybil Fagin.

On cross-examination, Covey denied that the warmest temperature reading he had taken in the defendant's suite was 82 degrees. He stated that it did get warmer, particularly in the afternoon. The readings varied from day to day depending on the amount of sun and shade. Covey took care of some of the problems but could not fix the system completely due to the design deficiency in it. He acknowledged that in large buildings some areas are warmer than others. He did not install a thermometer in defendant's suite although he did in others, since defendant's space was not as serious a problem as the others.

On redirect examination, Covey testified that the industry standard for comfortable temperature is 76 degrees.

James Mackey, who testified earlier, testified that there were delays before they could move into the building on Hawthorne Parkway because the building was not completed. He was not aware of any money paid to the defendant as a result of these delays. When they moved in, he noted that the heating and air conditioning did not work. It was very, very warm in the suite and in a number of other office suites in the building as well. If the temperature was 60 degrees outside, it was generally 85 degrees in his office. They made continual complaints about the situation to Floyd Coats or Matt Covey and for quite a while charted the temperature in the suite on a day-to-day basis. The highest temperatures were in the 90-degree range. It

was so unbearable that Mackey either went home or out on the road. He was advised by the defendant toward the end of their occupancy that both parties would be held harmless, and he saw documentation to that effect.

On cross-examination, Mackey testified that the heating and air conditioning problems occurred primarily in the fall, spring, and summer. He did not keep written records of the temperatures, but someone in their suite did, either the defendant or the secretary.

The defendant, Michael Hagan, testified that he is 32 years of age, divorced, and lives at his mother's residence at 130 Midway Lane in Vernon Hills, with his two children, of whom he has custody. At the present time, he owns a legal service business called National Legal Network. Defendant then provided a lengthy narrative of the various businesses he has owned, culminating in 1981 with his forming of Legal Guardian of America, which packaged legal services and sold memberships to persons or groups. This company and all of the businesses that defendant had had are owned by the Hagan Corporation. Eventually, the name was changed to Legal Corporation. At its peak, the corporation had 20 to 25 salespersons and administrative staff. Prior to 1986, the corporation was located in Libertyville.

In 1986, the Hagan Corporation moved to their Hawthorne Parkway address, in Vernon Hills, Illinois. The lease was for five years, and the gross rental rate was $18.50 per square foot per month. Although they were scheduled to move in August 1, 1986, they were unable to move in until November 1, 1986. Defendant had been negotiating with another building because they had been unable to occupy the Hawthorne building, and as an incentive not to lease elsewhere, the owner of the Hawthorne building offered $8,600, which was tendered to defendant after he moved in. Although there were no heating or air conditioning problems in the winter of 1986-87, the office was not totally completed for nine months. In the spring 1987, the air conditioning had not yet been turned on, and, because the windows had not been properly solar treated, the temperature in the building rose to "ridiculous" levels. Because of the variable air conditioning system, the air conditioning could not solve the problem. Defendant contacted Floyd Coats, the building manager, and representative for Coldwell Banker, and began a log of the temperatures in the office suite. In the summer, it was never below 80 degrees in the office and when the temperature was in the upper 80- and 90-degree range outside, it was over 100 degrees inside the suite.

In March 1988, defendant met with Sybil Fagin, the new representative for Turner, Alan Kracower, who occupied the suite next to

the defendant's, and Dan Dohlson from Turner. Ms. Fagin discussed the air conditioning problem and what were going to be done to fix the problem. Defendant told Ms. Fagin about the problems the tenants were having and in the past that the typical response from the management company had been that after all the office space was free. He also informed them that the problems needed to be fixed immediately or some type of legal action would be taken.

In April, Ms. Fagin contacted defendant and the other tenants to tell them that the work would begin that month. By May 1, 1988, no work had been done. Defendant, who was in Atlanta, received a call from Coldwell Banker. When he returned the call, he was asked if he were going to pay the rent which was then due. Defendant informed Coldwell Banker that he was not going to pay the rent because it was too hot in the suite.

Defendant testified further that he met with Ms. Fagin and Frank Friedman, the attorney for Turner. Friedman told defendant he was going to be sued if the rent was not paid, to which defendant responded that he not going to pay the rent but offered to negotiate. Defendant showed them estimates to repair the air conditioning, offered to pay for the installation of new air conditioning if it could be deducted from the rent, or he offered to split the cost, but he was informed that the building was broke. A week later defendant was contacted by Friedman, and by the end of May a resolution was reached under which defendant was permitted to stay until the end of August. At the end of August, as the company was moving out of the Hawthorne Parkway building, the deal with a new space fell through, and the office equipment was placed in storage. Defendant's business was then conducted out of his car and the cars of the salespeople.

Defendant further testified that he began experiencing difficulties in completing deals to rent office space. Defendant was informed that brokers from his previous building and two police officers, Dan Colin and Donald Verbecke, were giving out information that defendant had been evicted from the Hawthorne Parkway building. He was also informed that the police were investigating him and that the brokers were informing people that the settlement of the Hawthorne lease was false. He called Donald Verbecke at the State's Attorney's office, who refused to talk to him.

In November, defendant was arrested and charged with theft by deception and impersonating a judicial officer, based upon the sale of the legal services to the Lake Forest police association. Accounts of his arrest appeared in the newspapers. Later the charges were dismissed.

In January 1989, in order to discover how the false information about him was being disseminated, the defendant designed a plan whereby he would pretend to be interested in renting office space in areas he was not really interested in being located. Because he would be interested in large amounts of space, people would want to make a deal with him, and a thorough financial search would be done.

Defendant first approached the 1300 building on Woodfield Drive, Schaumburg. Defendant advised Michael Flynn, who represented the building, that he needed 14,000 square feet. Flynn advised him that they needed to check his background and requested financial information. Defendant provided him with financial statements and tax returns that indicated a company large enough to justify that amount of office space. Defendant pressed Flynn for what kind of credit information Flynn was receiving about him. Defendant did not understand why Flynn testified that defendant gave him a Vernon Hills address when the information defendant gave him had the Hawthorne Parkway address on it.

Defendant further testified that he called Flynn on February 3, 1989, about what credit information Flynn had about the defendant. Flynn refused to go any further without a space plan. The next day, Flynn called him and requested some bank information. Defendant testified that, since he does not have a major credit card, in order to rent a car he has his bank prepare a letter stating he has accounts that are in good standing. Laura Jones prepared such a letter for him on January 27, 1989. This was done before he ever developed his "ruse" or contacted Flynn. He was at Mail Box, Etc., preparing to fax the letter from the bank to Flynn when he discovered he had left it at home. He called his mother and told her that he would drop the cover sheet, which he had already filled out, by the house and that she should go to Mail Box, Etc., and fax the cover sheet along with the letter from the bank to Flynn.

The next day, he spoke to Flynn, who inquired as to who Donald Verbecke was. Defendant asked him where he had gotten the information, and Flynn told him some brokers for Coldwell Banker had faxed him information concerning the defendant's arrest and indictment for theft, deception, and impersonating an attorney. Flynn had also spoken with Dan Colin and Ray Carol of the Attorney General's office. Flynn was not sure whether the information would "kill" the deal. According to defendant, now that he had the information he was looking for, he told Flynn he no longer intended to rent the premises. Flynn, however, continued to contact him to put the deal together. Defendant used Lowell Stone's name as the broker because he was a

friend and business associate, and when the defendant was finally able to rent space, Stone would get a commission.

Defendant further testified about his dealings with Mary Riley, Brian Zatz, and Steve D'Andrea. He did not tell them he had previously resided in Vernon Hills. This seemed to eliminate any information from Coldwell Banker but not the information being received from Dan Colin or Donald Verbecke from the State's Attorney's office. Defendant stated that he had been contacting the leasing agents but it was all part of the "ruse" to find out from where the false information about him was emanating. For the same reasons, he picked Kenosha instead of Vernon Hills as the location for his company and stated he lived in Lake Forest rather than Vernon Hills. He admitted lying to Mary Riley about where he lived and the school his children attended.

On cross-examination, defendant acknowledged that he gave income tax returns to Flynn which did not accurately reflect his company's financial status but which were designed to make Flynn believe his company would qualify for the large enough space to continue the credit search defendant needed done. Even though in dealing with Flynn defendant found the source of the information, he felt he needed more information and witnesses to prove it. Defendant acknowledged that he gave the January 27, 1989, letter prepared by Laura Jones to Ron Garvey, Mary Riley's boss. His purpose in doing so was to gather information.

Defendant further acknowledged that there is no such company as the Boehm Management Company and that he made up the name "Louis J. Fazio." He also prepared the letter that was sent under that name.

Defendant maintained that he made no changes to the letter from the bank prepared by Laura Jones. He stated that the letter remained sealed in his briefcase until, upon his instructions, his mother took it to Mail Box, Etc., to be faxed to Michael Flynn. He acknowledged that the bank balances on the letter were wrong but that they were put there without his knowledge.

Defendant testified further that at the end of April 1989 he had all the information he felt he needed. In June 1989, he had business dealings with Chris Picone. He admitted accepting a check from Picone for rental concession, not as a real estate commission, for approximately $18,000. He denied telling Picone that he lived in Lake Forest. When they looked at the possible rental space, he told Picone that he had 15 to 20 employees. Defendant told Picone very little about himself and his business but what he told him was truthful.

However, the only thing he told Picone that was untrue was that he was unable to disclose any information because his company was considering going public. Defendant denied telling Picone that he anticipated raising $20 million on the Vancouver Exchange; it was an option, but not for that amount.

Defendant testified further that at the time his business was at the Hawthorne Parkway building, he had four employees and about five when he moved out. He had approximately $30,000 in his account at First Midwest Bank of Mundelein when he moved out of Hawthorne Parkway. He had accounts at other banks as well. In the building he is presently renting from Chris Picone, he has 25 desks and chairs and some tables which were already in the office which he rented as part of the lease.

On redirect examination, defendant testified that he is presently renting office space in Lake Forest. He negotiated for that space through a broker who was represented by Chris Picone, an attorney. He was able to rent the space on a sublease. First United Realtors paid the rent, and Picone worked for them. While negotiating the sublease with Picone, defendant told him he would not give him any information; if they wanted to rent to him, they would just have to take their chances. According to the defendant, he knew if he gave out any information, the same information from the State's Attorney's office and Coldwell Banker would be disseminated again, but that was not the reason he gave Picone. The lease contained a statement that the sublease was entered into without any disclosure by the defendant.

Alan Kracower testified that he is an urban planner and real estate consultant. He has occupied office space at 175 East Hawthorne Parkway in Vernon Hills, Illinois, since 1986. According to the witness, for the first couple of years, the air conditioning and heating systems of the building were inoperative, which had an adverse affect on his business. He was familiar with the defendant's office suite and testified that in terms of that defendant's space was worse than his. He recalled that the defendant kept a thermometer. He has instructed his corporation's attorney to sue the owners of the Hawthorne Parkway building because of these problems.

On cross-examination, Kracower testified that conditions have improved in the building. He has stayed in the building but not by choice. On redirect examination, Kracower stated that the system had been improved within the last 12 months.

Norman Cotteleer testified that he is the president of National Legal Network, which is owned by the defendant. He confirmed that defendant's intent in looking at office space was not to rent it but to

find out why he had been unable to rent office space.

Christopher Picone testified in rebuttal for the State that he is a senior vice-president and general counsel for the Hammer Holding Group, a diversified holding company for several real estate related companies. In April 1989 he met with defendant, Lowell Stone, defendant's real estate broker, Norman Cotteleer, a woman he presumed was head of defendant's administrative staff, and Tom Blake, one of Picone's commercial real estate agents. Defendant told Picone that he was a long time resident of Lake Forest, that his children attended school in Lake Forest, and he was looking for office space in Lake Forest to be close to home.

According to Picone, discussions over the possible leasing of office space by defendant occurred over a period of a couple of weeks. Defendant indicated that he had several companies, the predominant one being a prepaid legal service organization which had been in existence since 1976. Defendant also told him that he was in the process of having a public offering on the Vancouver Stock Exchange. Defendant informed Picone that his main office was in Kenosha, and the name of the building was the Hagan Corporation building. He also gave Picone the name of Nick Fratieno of Boehm Management, who he said was the management agent for the building. He also told Picone that he had 1,000 employees and offices nationwide and had contracts with national labor unions and major corporations to provide prepaid legal services. According to Picone, the defendant stated that he was going to make $20 million by the public offering.

Picone testified that he requested financial information, bank references, and whether personal guarantees would be available. He also requested references from the companies with which defendant had contracts. Defendant always responded that because of the inside trading problem, he could not give out any information. He did receive one financial document faxed to him.

On cross-examination, Picone testified that the language in the lease to the effect that the leasing tenant does not rely on any representation made by the defendant was to avoid any problem with his public offering. The only financial document received stated that the information was being provided on the basis that the parties had already agreed to enter into a sublease and that it was only for the purpose of structuring the sublease and that the company information was public information.

According to Picone, the sublease was signed on the morning of May 12, 1989. On the afternoon of May 12, 1989, he was called by Dan Colin, who told him that there were some problems with the

defendant and questioned Picone as to the transaction with the defendant. At the present time, there is a lawsuit pending to have the defendant vacate the space.

The defendant testified on rebuttal that he had advised Picone that he would not give him any background information and that the deal probably could not be done on that basis. Defendant explained to Picone that the problem was the prospective public offering, but in actuality it was to prevent the same misinformation being spread by Dan Colin, Donald Verbecke, and Coldwell Banker. Defendant told Picone he had nothing to lose; either defendant paid the rent or he did not. When Picone mentioned the broker's fees, it was agreed that each side would take care of his own broker. Picone did tell the defendant that he had done some "investigating" on his own and that defendant's company was "fine." Once there was an agreement, certain information was faxed to Picone for the sole purpose of signing the sublease. Defendant still occupies the space.

On cross-examination, defendant acknowledged that he lied to Picone when he told him that his company was going public on the Vancouver Stock Exchange. When Picone asked why he would not tender any information, defendant told him he did not want to jeopardize the public offering. He withheld the information because he did not want Dan Colin to talk to Picone.

Following closing arguments, the trial court found the defendant guilty of both attempted theft by deception and forgery, and imposed the aforementioned sentence. This appeal followed.

Defendant contends, first, that he was not found guilty of attempted theft by deception beyond a reasonable doubt. We agree for we are of the opinion that the State failed to prove that the defendant took a substantial step toward the commission of theft by deception.

■ Section 8—4(a) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 8—4(a)) provides:

> "A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense."

Section 16—1 of the Code provides in pertinent part as follows:

> "A person commits theft when he knowingly:
> ***
>
> Obtains by deception control over property of the owner *** and
>
> Intends to deprive the owner permanently of the use or benefit of the property." (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)(1)(A).)

In order to establish the offense of attempt, the State must establish that the defendant intended to commit a specific offense and that he committed an act that constitutes a substantial step toward the commission of that offense. *People v. Terrell* (1984), 99 Ill. 2d 427.

■ Assuming, *arguendo*, that the evidence was sufficient to show that defendant possessed the intent to commit the offense of theft by deception, we find that the evidence falls short of establishing that defendant took that substantial step. In *People v. Brown* (1979), 75 Ill. App. 3d 503, the court stated:

> "Determining what constitutes a 'substantial step' under our attempt statute has been one of the most troublesome problems of our criminal law. [Citation.] On the one hand, it is clear that mere preparation to commit a criminal offense does not constitute a 'substantial step' for the purposes of the attempt statute. [Citations.] On the other hand, it is equally clear that to constitute an attempt it is not necessary to prove that the defendant performed the last deed immediately preceding that which would render the substantive crime complete. [Citation.] Each attempt case must be answered on its own unique facts, and the essential question which must be answered is whether, given the intent to commit a specific offense, the defendant performed acts bringing him in 'dangerous proximity to success in carrying out his intent.' [Citation.]" *Brown*, 75 Ill. App. 3d at 505.

In addition to evaluating each case individually, an analysis of cases which have defined "substantial step" also provides guidance. (*Terrell*, 99 Ill. 2d at 433.) Moreover, the court in *Terrell* also noted that the Model Penal Code set forth a list of acts which may be considered to be a substantial step, when strongly corroborative of the actor's criminal purpose, one of which is "(f) possession, collection, or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances." (99 Ill. 2d at 436.) In that regard, we will proceed to examine the facts in *People v. Vettese* (1978), 61 Ill. App. 3d 279.

In *Vettese*, defendant was convicted of attempted theft by deception. Defendant falsely represented himself as the agent of an owner of property to a potential buyer. The defendant met with the buyer and his attorney to discuss the terms of the sale. The buyer agreed to place $500,000 in escrow, and the defendant furnished a tract search and a verified power of attorney. An attorney, hired by the defendant,

met with the owner of the property (in reality one of the codefendants) and upon being shown identification, obtained his signature on a deed and a trust agreement. When the attorney contacted the real owners, the ruse was discovered, and the charges were brought against defendant.

In finding that the evidence showed the commission of a substantial step, the *Vettese* court stated:

> "The proof required to support the conviction for attempt theft by deception was an act by the defendant, or any other member of the group, that constituted a substantial step toward completion of the agreed upon offense. In our view, the execution of the trust deed and the letters of direction to complete the land transfer constituted a substantial step toward completion of the theft. Had there been no detection of the fraudulent transfer at this point, the theft would have gone on to completion." *Vettese*, 61 Ill. App. 3d at 282-83.

In the case before us, defendant and Flynn never signed a lease for the rental of the property. In fact, it appears that Flynn's concern about the defendant was so great that no lease was ever drawn up for signature. The signing of the lease would have been the "substantial step" necessary to complete the crime of attempt. Anything less under the facts of this case is mere preparation and, thus, is insufficient for a conviction of attempted theft by deception. *People v. Brown* (1979), 75 Ill. App. 3d 503.

We conclude, therefore, that defendant's conviction of attempted theft by deception must be vacated.

Next, defendant contends that he was not proved guilty of forgery beyond a reasonable doubt.

Section 17—3 of the Criminal Code provides in pertinent part as follows:

> "A person commits forgery when, with intent to defraud, he knowingly:
>
> ***
>
> (2) Issues or delivers such document knowing it to have been thus made or altered." Ill. Rev. Stat. 1989, ch. 38, par. 17—3(a)(2).

Defendant argues, first, that venue was not proved beyond a reasonable doubt. Assuming that the defendant delivered the letter from Laura Jones to Mail Box, Etc., in Vernon Hills, Lake County, it was "faxed" to and received by Michael Flynn in Des Plaines, Cook County.

A charge that a crime was committed in a particular county is

a material averment which must be proved beyond a reasonable doubt to sustain a conviction, although it may be proved by circumstantial evidence. (*People v. Clark* (1979), 71 Ill. App. 3d 381, 396.) The situs of a crime is to be determined from the nature of the crime alleged and the location of the act or acts which constitute it; however, if a crime against the State is committed partly in one county and partly in another, venue may be proper in either county. *Clark*, 71 Ill. App. 3d at 396.

■ Defendant relies on *United States v. Beech-Nut Nutrition Corp.* (2d Cir. 1989), 871 F.2d 1181. In that case, the court of appeals held that telephone calls preparatory to the substantive offense were insufficient on which to predicate venue. However, as the State points out, the court there noted that "[their] communications were not part of the offense of introducing the offending juice into commerce but were merely prior and preparatory to that offense." 871 F.2d at 1190.

In the case before us, the gist of the offense is that defendant sent or caused to be sent a document to Flynn capable of defrauding him. The step was not merely preparatory, but was indeed integral to the commission of the offense charged in the indictment. As such, venue would have been proper in either Lake County or Cook County. See *People v. Clark* (1979), 71 Ill. App. 3d 381.

■ Defendant also argues that the identification of the sender of the "fax" was not proved beyond a reasonable doubt. On the contrary, even if defendant's testimony is believed, it was his testimony that he instructed his mother to "fax" the letter from Laura Jones to Michael Flynn. Therefore, the identity of the sender was proved beyond a reasonable doubt.

■ Defendant further argues that the letter prepared by Laura Jones was not capable of defrauding another, as required by the statute. The test is "whether a reasonable or ordinary person might be deceived into accepting the document as genuine." (*People v. Bokuniewicz* (1987), 160 Ill. App. 3d 270, 274.) There is no requirement that someone actually be defrauded. 160 Ill. App. 3d at 274.

Defendant maintains that the State was attempting to prove a fraud as to defendant's attempt to obtain free rent, not fraud as to defendant's bank balances. While that might be true in the case of count XII, which charged attempted theft by deception, count X, which charged the forgery, clearly charged the fraud as the misrepresentation of defendant's bank balances. The fact that Flynn did not or would not enter into a lease agreement with the defendant does not establish that the document was incapable of defrauding another.

We conclude, therefore, that the defendant was found guilty of

forgery beyond a reasonable doubt.

■ Next, the defendant contends that he was prejudiced by the admission of improper evidence.

Defendant argues that the bank records of the Hagan Corporation were admitted into evidence without a proper foundation. Section 115—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—5(a)) provides for the admission of business records as follows:

> "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any such act, transaction, occurrence, or event, if made in regular course of any business, and if it was in the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

> All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

Laura Jones, a personal banker employed by First Midwest Bank testified that the bank records are kept in the regular course of business and are recorded promptly. She identified photocopies of the checks and bank statements of the Hagan Corporation as records that the bank keeps in the course of its business. Dan Colin testified that he received the Hagan Corporation's bank records from the keeper of records. Defendant argues that, because on cross-examination Ms. Jones testified that she did not know how the record keeping process worked and that she thought the records only looked like they came from her bank, the testimony was insufficient to establish a foundation for the admission of these records. However, only proof that the records were made in the regular course of business and that it was in the regular course of business to prepare such records is necessary. (*People v. Collins* (1979), 70 Ill. App. 3d 413, 428.) Ms. Jones' testimony clearly established those elements. Defendant's argument goes to the weight given the testimony not to the admissibility of the records. The weight given to the testimony is a matter for the trier of fact, and we see no reason to disturb his decision.

We conclude that the bank records were properly admitted. Defendant's objections to the records on the basis that they were computer generated is waived, because defendant failed to object to the records on that basis in the trial court and, further, failed to raise that argument in his post-trial motion. See *People v. Romano* (1985),

139 Ill. App. 3d 999.

■■ Defendant also argues that there was no foundation for the admission of the letter faxed to Michael Flynn.

In general, a facsimile machine or "fax" transmits and receives printed or pictoral matter or documents from one location to another, typically over telephone lines. (*Secure Services Technology, Inc. v. Time & Space Processing, Inc.* (E.D. Va. 1989), 722 F. Supp. 1354.) Both parties to this appeal note the lack of prior decisions relating to the foundational proof necessary for the admission into evidence of faxed documents.

Defendant seeks to draw an analogy between facsimile machines and computers and requests that this court adopt the same foundational requirements. (See *People v. Holowko* (1985), 109 Ill. 2d 187 (computerized telephone tracing equipment); *People v. Bovio* (1983), 118 Ill. App. 3d 836 (computer-generated bank statements).) In the case of computer records, this court has held that foundational proof is required to show that the generating system was standard, unmodified, and properly operated. (*Bovio*, 118 Ill. App. 3d at 842.) The State acknowledges that authentication is necessary for any document to be admitted but notes that, in the case of telegrams, authenticity may be shown by indirect and circumstantial evidence. 29 Am. Jur. 2d *Evidence* §883 (1967).

Lacking the guidance of prior authority on this point, we begin by noting that telegrams and fax documents are similar in that the information is transmitted over wires and a document is originated at the receiving end. In neither case is the original document received. In the case of the telegram, the information is put into written form at the receiving end; in the case of the fax, a copy of the document "faxed" is received. Thus, the facsimile machine is more trustworthy than the telegram since it does not rely on a transcribing of the document at the receiving end. Moreover, the facsimile machine does not perform calculations as in *Bovio* which would require this court to scrutinize it more thoroughly than those systems which merely retrieve information. See *Bovio*, 118 Ill. App. 3d at 842.

At trial, Julie Murphy testified that on February 7, 1989, the defendant came into Mail Boxes, Etc., where she is employed, to fax a document. She identified the cover sheet that accompanied a fax transmission from her location from the company name, the time and date that it was sent, which appears at the top of the cover page, as well as on the faxed copy. On cross-examination, she explained that a customer fills out the cover sheet which tells the recipient for whom the fax is, from whom it is, and how many pages there are so that in

case there is any difficulty with the communication, they can be contacted. Her name appears on the cover sheet in the event the fax needs to be resent. The customer keeps the original of the document.

We note that defense counsel thoroughly cross-examined Ms. Murphy as to her identification of the defendant as the person who sent the fax, as well as her identification of the document faxed. It was clear that she made the identification based upon the information printed on the top of the document as to time, place, and date.

Michael Flynn identified the letter as the document that had been received via his fax machine to his office in Des Plaines, Illinois, and that his secretary had placed the letter on his desk. Defense counsel also thoroughly cross-examined Flynn on the issue of the faxed letter. Flynn admitted that the letter did not reflect any markings indicating it was received by Flynn's fax machine. He further admitted that by just looking at a document, he could not tell whether it had been received by his fax machine.

The defendant objected to the admission of the letter on the basis that from the testimony of Julie Murphy and Michael Flynn, there was no showing of the identity of either the person faxing the document or the identity of the document itself.

The State argues that, because the defendant made only a general objection to the foundation for the admission of the letter and did not challenge the admission on the basis that the fax machine had malfunctioned or sent the wrong message, the issue is waived. (See *People v. Romano* (1985), 139 Ill. App. 3d 999.) The defendant counters that, in his post-trial motion, he alleged that there was no evidence concerning the equipment itself.

Both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176.) Therefore, we agree with the State that the objection now raised on appeal to the admission of the faxed letter has been waived. Even had we concluded otherwise, we are of the opinion that the letter faxed to Michael Flynn from Mail Boxes, Etc., was properly admitted into evidence.

We have previously resolved against the defendant the issue as to the identity of the sender of the faxed letter. We further observe that there was no credible evidence that Julie Murphy, Laura Jones, defendant's mother or Michael Flynn's secretary altered the letter in question. There was testimony as to the procedure followed for sending a document by fax and as to how it was received by Michael Flynn. Ms. Murphy identified the letter defendant faxed or caused to be faxed to Flynn, and Flynn identified it as the letter he received.

All of this testimony was subjected to extensive cross-examination by the defendant. In light of the circumstances of this case, the trial court did not err in admitting the faxed letter into evidence.

Defendant also argues that the trial court improperly admitted evidence of "similar conduct" and irrelevant evidence. We have carefully examined the evidence and conclude that this evidence pertained to the attempted theft charge which we have vacated. There is no indication in the record that defendant's forgery conviction and the sentence imposed for that charge were in any way tainted by the admission of that evidence. Hence, we need not reach the merits of those arguments.

Finally, defendant contends that his convictions of both attempted theft by deception and forgery are improper. Since we have vacated defendant's conviction of and sentence for attempted theft by deception, we need not reach the merits of this issue.

The defendant's conviction of and sentence for the charge of attempted theft by deception are vacated. Defendant's conviction of and sentence for the charge of forgery are affirmed.

The judgment of the circuit court is reversed in part and affirmed in part.

Affirmed in part; reversed in part.

UNVERZAGT, P.J., and REINHARD, J., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

JUSTICE WOODWARD delivered the opinion of the court:

In his petition for rehearing, the defendant contends that the case should be remanded for a new sentencing hearing in light of the fact that this court reversed his conviction of attempted theft by deception while affirming his conviction of forgery.

Defendant raises this issue for the first time in his petition for rehearing, in violation of Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)). Defendant points out that he sought such relief in the "Conclusion" part of his appellant's brief. Yet nowhere in his brief did he present any argument or cite any authority in support of the granting of such relief and, thus, waived the issue of a new sentencing hearing. 113 Ill. 2d R. 341(e)(7).

Assuming, *arguendo*, that we were to consider the merits of the resentencing issue, we are of the opinion that a new sentencing hearing is not required here. Where a defendant is convicted of multiple

offenses, reversal of one conviction does not *per se* require that the defendant be resentenced on the remaining conviction or convictions, as long as the record shows that the trial court considered the offenses separately and sentenced the defendant separately on each offense. (*People v. Kosanovich* (1979), 69 Ill. App. 3d 748, 750.) Defendant correctly notes that at the sentencing hearing the trial court did not delineate between the two offenses. However, the trial court did state that a jail term was necessary in this case to protect the public and imposed the same four-year sentence for each offense. We are convinced that the sentences imposed in this case were not so interrelated as to require a new sentencing hearing.

The petition for rehearing is denied.

UNVERZAGT, P.J., and REINHARD, J., concur.