Docket No. 101612.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MICHAEL L. PERRY, Appellee.

*Opinion filed February 16, 2007.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Karmeier and Burke concurred in the judgment and opinion.

Justice Fitzgerald dissented, with opinion, joined by Justice Kilbride.

## OPINION

After a jury trial in the circuit court of Du Page County, defendant Michael L. Perry was convicted of theft by deception (720 ILCS 5/16–1(a)(2) (West 2000)). Based on the value of the stolen property, his crime was classified as a Class 2 felony and he was sentenced to a term of six years' imprisonment and ordered to pay restitution. 720 ILCS 5/16–1(b)(5) (West 2000). On appeal, the court held that he could be convicted only of the lesser offense of theft of property valued in excess of $300, but less than $10,000 (720 ILCS 5/16–1(b)(4) (West 2000)), a Class 3 felony, and remanded for a new

sentencing hearing. 361 Ill. App. 3d 703. We granted the State's petition for leave to appeal, under Rules 315 and 604(a)(2) (210 Ill. 2d Rs. 315, 604(a)(2)), to determine whether defendant was properly convicted of theft of property valued in excess of $10,000 when the property at issue was the occupancy of a hotel room for a period of more than three months. In addition, we consider defendant's request for cross-relief on his claim of ineffective assistance of trial counsel.

BACKGROUND

Defendant, along with his wife and children, occupied a suite at the Embassy Suites hotel in Lombard, Illinois, from January through April 2000. The testimony at trial revealed that after staying at the hotel for several weeks, defendant sought to negotiate a reduced rate for the room. He also requested that the cost of his stay be billed to a company of which he was the president, Prolific Development Corporation (Prolific). He provided several trade references and a credit card in the name of Bryan Green.

The hotel manager drafted a document headed "RATE AGREEMENT February 2000–December 30, 2000." The agreement provided for a rate of $130 per night for a two-room suite, with a minimum stay of 100 nights "on an annual basis." Both parties signed the agreement. Several days thereafter, the hotel controller sent a letter to defendant at the address he had provided for Prolific, confirming that billing statements would be sent to the corporate address and that the hotel's "net terms are 30 days from each statement date."

After four bills sent to the business address went unpaid, the hotel's controller slid a letter under defendant's hotel room door. The letter noted that payment was more than 60 days past due and that the balance on the account was over $12,000. Defendant did not respond to the letter.

Eventually, it was revealed that the person defendant identified as the contact person for Prolific was not actually connected with the company. The hotel was also unable to contact the company using the e-mail address provided by defendant. Bills and letters that had been sent to the business address were returned to the hotel by the post office in a single envelope marked "Address Unknown." When the

trade references were eventually contacted, one reported that defendant did not have a valid account. Another reported that defendant was not in good standing and owed it money.

At various times, defendant explained to members of the hotel staff that he was having problems with the post office, that he had submitted the bill to his accountant for payment, that payment would be made by May 9, 2000, that payment would arrive "any day," and that the check was being "cut from another company" about which he was unable to provide any information.

On the afternoon of May 12, 2000, the hotel contacted the Lombard police department. An officer responded and, along with several members of the hotel staff, went to defendant's room to speak to him. He was not present, so they left a message with his wife. Defendant did not respond to the message.

During the night shift on May 13, 2000, defendant and his family vacated the hotel room without checking out or settling the bill. Although defendant paid a small portion of his bill by credit card during the early part of his stay, the unpaid balance for the room, restaurant, laundry services, telephone, and other charges exceeded $15,000. An attempt by the hotel to charge some of these expenses to the credit card in the name of Bryan Green, which defendant had provided earlier, was unsuccessful because the individual named on the credit card disputed the charges.

A Du Page County grand jury returned an indictment charging defendant with theft by deception "of property exceeding $10,000 and not exceeding $100,000 in value." 720 ILCS 5/16–1(a)(2), (b)(5) (West 2000). He remained free on bond but failed to appear on January 9, 2001. The following month, he was taken into custody in Georgia. He was returned to Illinois in April 2001.

After a jury trial, defendant was convicted of the theft and sentenced accordingly. 720 ILCS 5/16–1(b)(5) (West 2000). The additional charge of violating his bail bond and failing to appear was nol-prossed by the State.

ANALYSIS

Part C of the Criminal Code of 1961 codifies the law of offenses against property. Article 15 therein defines various statutory terms used elsewhere in part C, including the term "property." Article 16 defines theft and related offenses. Defendant was charged with theft under section 16–1:

> "(a) A person commits theft when he knowingly:
>
> ***
>
> (2) Obtains by deception control over property of the owner; ***
>
>          * * *
>
> *** and
>
> > (A) Intends to deprive the owner permanently of the use or benefit of the property[.]" 720 ILCS 5/16–1(a)(2)(A) (West 2000).

Depending on the value of the stolen property and other facts, the crime of theft may be punished as a Class A misdemeanor, a Class 4, 3, 2, or 1 felony, or a Class X felony. 720 ILCS 5/16–1(b) (West 2000). "Theft of property exceeding $10,000 and not exceeding $100,000 in value is a Class 2 felony." 720 ILCS 5/16–1(b)(5) (West 2000). "When a charge of theft of property exceeding a specified value is brought, the value of the property involved is an element of the offense to be resolved by the trier of fact as either exceeding or not exceeding the specified value." 720 ILCS 5/16–1(c) (West 2000).

"Property" is defined in section 15–1 as follows:

> " '[P]roperty' means anything of value. Property includes real estate, money, commercial instruments, admission or transportation tickets, written instruments representing or embodying rights concerning anything of value, labor, or services, or otherwise of value to the owner; things growing on, affixed to, or found or land, or part of or affixed to any building; electricity, gas and water; telecommunications services; birds, animals and fish, which ordinarily are kept in a state of confinement; food and drink; samples, cultures, microorganisms, specimens, records, recordings, documents, blueprints, drawings, maps, and whole or partial copies, descriptions, photographs, computer programs or data, prototypes or models thereof, or any other articles, materials,

devices, substances and whole or partial copies, descriptions, photographs, prototypes, or models thereof which constitute, represent, evidence, reflect or record a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention, or improvement." 720 ILCS 5/15–1 (West 2000).

Relying on *People v. Davis*, 203 Ill. App. 3d 838 (1990), the appellate court concluded that the occupancy of a hotel room is not "property" as that term is defined in section 15–1. As a result, the stolen property consisted only of food and other incidentals obtained by defendant, valued at over $300, but less than $10,000, and punishable as a Class 3 felony. 720 ILCS 16–1(b)(4) (West 2000).

The *Davis* defendants were indicted for theft of property after it was alleged that they instructed city employees to engage in political activities such as the collection of absentee ballots during time that they were being paid by the City of East St. Louis to work on a public works project. *Davis*, 203 Ill. App. 3d at 841. The trial court dismissed the indictments on the basis that the labor of an employee is not the property of the employer and, thus, diversion of the employee's labor is not a theft. *Davis*, 203 Ill. App. 3d at 841-42.

The appellate court affirmed the dismissal of the indictments for several reasons. The court noted that "[a]t common law, only tangible personal property could be the subject of larceny" (*Davis*, 203 Ill. App. 3d at 844), and that section 15–1 was intended to add to this definition "things not embraced by larceny under common law." The court concluded that the statutory definition of property in section 15–1 includes only tangible personal property that was subject to larceny at common law, indicated by the phrase "anything of value," and those other items specifically enumerated in the following sentence. Further, the court stated that section 15–1 "only lists items which may be physically possessed and carried away." *Davis*, 203 Ill. App. 3d at 845.

In addition, the *Davis* court relied on the canon of construction that "[l]egislation in derogation of the common law is usually strictly construed." Thus, the court stated, the word "includes" in section 15–1 "should be considered an enumeration excluding all other things not in the specific category." *Davis*, 203 Ill. App. 3d at 846. Finally,

the court noted that "[c]riminal or penal statutes are to be strictly construed in favor of the accused." *Davis*, 203 Ill. App. 3d at 846.

In the present case, the appellate court noted that except for the subsequent addition of the term "telecommunications services," section 15–1 is identical to the statute at issue in *Davis*. 361 Ill. App. 3d at 712. The appellate court concluded that the *Davis* court "implicitly recognized that the word 'includes' as used in section 15–1 was ambiguous" because the *Davis* court noted that this word "has more than one reasonable meaning" and thereafter resolved the ambiguity by employing the rule that a statute in derogation of the common law must be strictly construed. 361 Ill. App. 3d at 712. The appellate court then found that "this resolution of the ambiguity was the proper one because it limits the expansion of the common-law definition." 361 Ill. App. 3d at 713.

Further, the appellate court reasoned that the "structure of section 15–1 also supports this conclusion." The legislature could have used two sentences instead of one, but instead of saying that property is "anything of value including" a list of examples, the legislature chose to use a separate sentence beginning with the phrase "[p]roperty includes." This structure, the appellate court concluded, "was intended to convey that the items specifically enumerated were in addition to, not part of, the general class." 361 Ill. App. 3d at 713. The appellate court also observed that the legislature has not amended the statute subsequent to *Davis*, so it may be presumed that it has "acquiesced in the court's interpretation of legislative intent." 361 Ill. App. 3d at 714. Because the use of a hotel room is neither tangible personal property nor one of the items specifically enumerated in section 15–1, the appellate court held that the right to use a hotel room is not property that can be stolen by deception under section 16–1.

Before this court, the State argues that the right to occupy a hotel room is property as that term is defined in section 15–1 of the Criminal Code because the leasehold interest created by renting a hotel room is a chattel, which falls under the common law definition of property that has been incorporated into section 15–1. The State also argues that the term "includes" in section 15–1 was not intended to limit the scope of the statutory definition to the enumerated items but, rather, to illustrate the types of property that the legislature intended to include in an expanded definition of property.

The principles guiding our analysis are well established. Our primary objective is to ascertain and give effect to legislative intent, the surest and most reliable indicator of which is the statutory language itself, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). In determining the plain meaning of statutory terms, we consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. *People v. Davis*, 199 Ill. 2d 130, 135 (2002). Where the language of the statute is clear and unambiguous, we must apply it as written, without resort to extrinsic aids to statutory construction. *People v. Collins*, 214 Ill. 2d 206, 214 (2005).

If the language is ambiguous, making construction of the language necessary, we construe the statute so that no part of it is rendered meaningless or superfluous. *People v. Jones*, 214 Ill. 2d 187, 193 (2005). We do not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. *People v. Martinez*, 184 Ill. 2d 547, 550 (1998). The traditional canons or maxims of statutory construction are not rules of law, but rather are "merely aids in determining legislative intent and must yield to such intent." *In re Application of the County Treasurer*, 214 Ill. 2d 253, 259 (2005).

In the present case, we are called upon to review the appellate court's construction of sections 15–1 and 16–1 of the Criminal Code (720 ILCS 5/15–1, 16–1 (West 2000)). The construction of a statute is a question of law, which we review *de novo*. *People v. Donoho*, 204 Ill. 2d 159, 172 (2003).

Whether the Occupancy of a Hotel Room Is "Property"

At common law, the crime of larceny was "the felonious stealing, taking and carrying, leading, riding or driving away the personal goods of another *** with the felonious intent to deprive the owner of his property." *People v. Pastel*, 306 Ill. 565, 568 (1923). Under this traditional definition of larceny, the occupancy of a hotel room clearly could not have been the subject of the crime.

Eventually, the common law crimes were codified by statute. As the State correctly notes, for at least 50 years prior to the adoption of the Criminal Code of 1961, some items that would not have been

subject to the crime of larceny at common law were nevertheless property subject to statutory theft. For example, in *Moline Water Power Co. v. Cox*, 252 Ill. 348 (1911), this court held that water power created by a waterfall was property under the theft statute at the time. This court explained:

> "[Water] [p]ower is not a chattel. It is not a tangible entity. It manifests itself only by its results. But it is property, and is bought and sold in the market as freely as the products of the farm. At common law it could not be the subject of larceny, which must be of goods and chattels, but it is now protected by statute to the same extent as other forms of property, and the unauthorized connection of any gas, water or electric current with a motor or other appliance is a misdemeanor, punishable by law. (Crim. Code, par. 117.) The use of a fall of water artificially impounded is that taking of that which has been produced by the combination of artificial means and natural forces, and partakes of the nature of a *profit à prendre*. It is, in fact, an interest in the aggregate of rights constituting the water power, which is real estate." *Moline Water Power*, 252 Ill. at 357.

Similarly, in *People v. Menagas*, 367 Ill. 330, 336 (1937), this court held that the defendant was properly charged with larceny of electrical energy because larceny under the Criminal Code (Ill. Rev. Stat. 1935, ch. 38, par. 380) had wider application than at common law. The larceny statute then said, " 'Larceny shall embrace every theft which deprives another of his money or other personal property, or those means or muniments by which the right and title to property, real or personal, may be ascertained.' " *Menagas*, 367 Ill. at 336, quoting Ill. Rev. Stat. 1935, ch. 38, par. 380.

Our Criminal Code underwent revision in 1961 and the section dealing with crimes against property was entirely reorganized.

> " 'Formerly, in Illinois, there were some seventy-four separate sections which dealt in one form or another with the obtaining of property of another with the intent to permanently deprive such other or the true owner of the property or its beneficial use. All lawyers and judges are too familiar with the highly technical differences between larceny, larceny by trick, embezzlement, false pretenses, confidence game, and the many

variations to require detailed comment. Suffice to say that, with the exception of robbery, burglary, arson, and criminal damage and trespass to property, which are covered respectively in Articles 18, 19, 20 and 21, the Committee intended to codify the entire range of offenses against property into Articles 16 and 17, and to abolish completely the labels and highly technical distinctions which had developed through centuries of case law and statutory amendments.' " *People v. McCarty*, 94 Ill. 2d 28, 34 (1983), quoting Ill. Ann. Stat., ch. 38, art. 16, Committee Comments–1961, at 18 (Smith-Hurd 1977).

With this background in mind, we turn to the question of whether the use of a hotel room is property that can be the subject of theft by deception under section 16–1. We note that this inquiry requires the interpretation of two separate statutes. First, we must determine whether the use of a hotel room is property under section 15–1. Second, if the answer to the first question is yes, we must determine whether one who obtains such property by deception can be charged under section 16–1.

The *Davis* court and the appellate court in the present case seem to have conflated these two inquiries. Section 15–1 does not define the term "property" only as that term is used in section 16–1. It defines the term "property" as it is "used in this Part C." 720 ILCS 5/15–1 (West 2000). Part C is titled "Crimes Against Property." In addition to the crimes of theft, robbery, burglary, and arson (720 ILCS 5/16–1, 18–1, 19–1, 20–1 (West 2000)), which were known at common law, part C defines offenses such as computer crime, wireless service theft, and financial identity theft (720 ILCS 5/16D–1, 16F–13, 16G–15 (West 2000)). Part C is clearly intended to be broad in scope.

The first sentence of section 15–1 states that the word "property" as it is used in part C "means anything of value." The appellate court, relying on *Davis*, limited the meaning of "anything" to items of tangible personal property. Because part C encompasses much more than the crime of theft, we must examine the definition of property in section 15–1 without regard to what types of property might or might not have been subject to larceny at common law. See *Concrete Materials Corp. v. Gordon*, 395 Ill. 203, 207-08 (1946) (common law definitions must yield to definitions of employee, employer, and

employment contained in the Unemployment Compensation Act); see also 34 Ill. L. & Prac. *Statutes* §51 (2001) ("The General Assembly has the power to make a reasonable definition of the terms used in an act, even though such definitions do not correspond with those contained in other acts. Statutory definitions control in the construction of the terms of an act, and the common-law definitions of those terms must yield to the statutory definitions").

The plain meaning of the first sentence of section 15–1 is that "property," when that term is used in any provision of part C of the Criminal Code, does indeed include *any thing* of value.

We note that the *Davis* court inaccurately stated that section 15–1 "only lists items which may be physically possessed and carried away." *Davis*, 203 Ill. App. 3d at 845, citing *People v. Zakarian*, 121 Ill. App. 3d 968, 972-73 (1984). *Zakarian*, in turn, relied on cases that predated the adoption of the Criminal Code of 1961. According to the *Zakarian* court, the test of whether property is embraced by the theft statute "is not whether the property is corporeal or incorporeal or tangible or intangible. Rather, it is whether the property is capable of being taken and carried away by someone other than the owner." *Zakarian*, 121 Ill. App. 3d at 972-73 (citing *Menagas*, 367 Ill. 330, and *Woods v. People*, 222 Ill. 293 (1906)).

The legislature's inclusion, in 1961, of real estate and electricity and, in 1994, of telecommunications services in the statutory definition of property encompassed by the theft statute did away with this ancient rule. Real estate cannot be taken and carried away, yet it is "property" under section 15–1. Similarly, electricity and telecommunications services can be stolen but cannot be taken and carried away. See *Menagas*, 367 Ill. at 336-38 (describing the test for whether an item is personal property as whether it may "be taken and carried away," "transported from place to place," and "bought and sold like other personal property," but noting that real property may also be the subject of larceny).

The phrase "anything of value" is unambiguous. Clearly, the legislature intended to expand the definition of property to include not only items of tangible personal property but also other things of value such as real estate, electricity, and telecommunications services. The hospitality industry provides lodging to the public for profit. The market for hotel and motel rooms is vast. The use of a hotel room

-10-

does have value. See *Moline Water Power*, 252 Ill. at 357 (stating that water power is property because it "is bought and sold in the market as freely as the products of the farm"). We conclude that the use of a hotel room is a thing of value as that phrase is used in the first sentence of section 15–1.

The appellate court, however, construed the word "includes" in the second sentence of section 15–1 to limit the types of "things" that come within the definition of property. The State argues that the weight of authority favors interpreting "includes" as a term of enlargement or illustration. Defendant argues that the appellate court properly construed the term as one of limitation.

Article 2 of the Criminal Code of 1961 contains "General Definitions." Section 2–10, which was not cited to this court by either party, states:

> " 'Includes' or 'including' means comprehending among other particulars, without limiting the generality of the foregoing word or phrase." 720 ILCS 5/2–10 (West 2000).

Although there have been no cases interpreting or applying this definition, its meaning is unmistakable. Either of these words, when followed by a listing of items, means that the preceding general term encompasses the listed items, but the list is not exhaustive. The preceding general term is to be construed as a general description of the listed items and other similar items.

Based on this statutory definition, we conclude that in enacting section 15–1 the legislature intended the definition of property to include not only items of tangible personal property, but also other things of value. The enumerated items are illustrative of types of property that would not have been within the scope of the traditional common law definition of property that could be the subject of larceny, but are within the scope of part C of the Criminal Code.

In light of this statutory definition, we reject the appellate court's suggestion that the term "includes" in section 15–1 is ambiguous because the words "but is not limited to" are not present. 361 Ill. App. 3d at 712, citing *Davis*, 203 Ill. App. 3d at 846 ("Although the word 'include' does not by itself necessarily limit general language, cases which support a broad or enlarging interpretation for the term 'include' do so in order to give effect to a legislative intent to provide

as large an access as possible to the general term. [Citation.] The word 'include' is sometimes used to add to the general class a species which does not naturally belong to it. [Citation.] In this case, the items listed after 'includes' should be considered an enumeration excluding all other things not in the specific category"). The appellate court concluded that because the word "includes" is sometimes used to expand a general term and is sometimes used to enumerate specific items to be added to the general term, it is ambiguous. The court noted that if the legislature had intended for the items following the word "includes" to be merely illustrative of items of property, "it could have written 'property is anything of value including.' " Based on the lack of such language and the fact that the "includes" language is in a separate sentence from the "anything of value" language, the court concluded that the second sentence "was intended to convey that the items specifically enumerated were in addition to, not part of, the general class." 361 Ill. App. 3d at 713.

The legislature has on many occasions used the phrases "including but not limited to" or "includes but is not limited to" to indicate that the list that follows is intended to be illustrative rather than exhaustive. An electronic search of the Illinois Compiled Statutes reveals 1749 statutes using the phrase "including but not limited to" and 249 containing the phrase "includes but is not limited to." Over a dozen of these provisions are contained in part C of the Criminal Code of 1961, "Offenses Against Property." See, *e.g.*, 720 ILCS 5/16–1.3, 16–18, 16–21, 16A–2.8, 16D–2, 16F–2 (West 2004).

We conclude, however, that even in the absence of the phrase "but is not limited to," the plain, ordinary, and popularly understood meaning of the term "includes" does not support the appellate court's conclusion. In determining the plain meaning of a statutory term, it is entirely appropriate to look to the dictionary for a definition. See, *e.g.*, *People v. Brooks*, 221 Ill. 2d 381, 390-91 (2006) (using dictionaries to provide the definition of the word "docket"); *People v. Hari*, 218 Ill. 2d 275, 292-93 (2006) (using dictionaries to provide the definition of the word "involuntary"); *U.S. Bank National Ass'n v. Clark*, 216 Ill. 2d 334, 347 (2005) (using dictionaries to provide the definition of the word "compensation").

According to Black's Law Dictionary, "include" means:

"To contain as a part of something. The participle *including* typically indicates a partial list <the plaintiff asserted five tort claims, including slander and libel>. But some drafters use phrases such as *including without limitation* and *including but not limited to*–which mean the same thing." (Emphases in original.) Black's Law Dictionary 777-78 (8th ed. 2004).

The law dictionary refers the reader to the term "namely," which means:

"By name or particular mention; that is to say <the plaintiff asserted two claims, *namely* wrongful termination and slander>. The term indicates what is to be included by name. By contrast, including implies a partial list and indicates that something is not listed." (Emphasis in original.) Black's Law Dictionary 1049 (8th ed. 2004).

Similarly, the editor of Black's Law Dictionary observes in another work that:

"[I]ncluding is sometimes misused for *namely*. But it should not be used to introduce an exhaustive list, for it implies that the list is only partial. In the words of one federal court, 'It is hornbook law that the use of the word *including* indicates that the specified list ... is illustrative, not exclusive.' *Puerto Rico Maritime Shipping Auth. v. I.C.C.*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981)." (Emphases in original.) B. Garner, A Dictionary of Modern Legal Usage 431 (1995).

Given the statutory definition of "includes" in section 2–10 and the plain and ordinary meaning of the word, the absence of additional verbiage such as "but not limited to" does not render section 15–1 ambiguous. In this section, the word "includes" is used to introduce a list of things of value that illustrate the meaning of the general term "property."

Defendant notes that the legislature has not changed the definition of property in the wake of *Zakarian* and *Davis* and argues that, if these cases had improperly construed section 15–1, the legislature would have acted to correct the error. He cites no authority for this proposition. This court has stated that " '[w]here the legislature chooses not to amend a statute after a judicial construction, it will be presumed that it has acquiesced in the court's statement of the

legislative intent.' " *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 50 (1998), quoting *Miller v. Lockett*, 98 Ill. 2d 478, 483 (1983). This presumption, however, is merely a jurisprudential principle; it is not a rule of law. The fact the legislature has not amended the definition of property in the years since *Zakarian* (1984) and *Davis* (1990) were decided is of little weight when the meaning of the statute is unambiguous.

We note, further, that *Zakarian* and *Davis* have not been extensively relied upon by Illinois courts. The appellate court's decision in the present case is the only published Illinois decision to cite *Davis* for its discussion of the meaning of "property" in the theft statute. *Davis*, in turn, is the only published Illinois decision to cite *Zakarian* for this purpose. Our decision in the present case necessarily overrules *Zakarian*, 121 Ill. App. 3d 968, and *Davis*, 203 Ill. App. 3d 838, with respect to the definition of the term "property" in the theft statute. The *Davis* court's conclusion that the labor of an employee does not *belong* to the employer is unaffected. *Davis*, 203 Ill. App. 3d at 841-42.

Because we hold that the use of a hotel room is a thing of value and is, thus, within the statutory definition of property in section 15–1, we need not consider whether registration as a guest in a hotel creates a leasehold interest that would be considered a chattel real at common law, as argued by the State, or an interest in real estate.

We respond briefly to the appellate court's application of the canon of construction that a statute in derogation of the common law must be strictly construed. *Davis*, 203 Ill. App. 3d at 846. "The rule in Illinois is that statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation." *Barthel v. Illinois Central Gulf R.R. Co.*, 74 Ill. 2d 213, 220 (1978). Thus, in *Barthel*, this court declined to construe the Public Utility Act to abrogate the common law defense of contributory negligence because it did not plainly appear to be the intent of the legislature to do so. *Barthel*, 74 Ill. 2d at 221.

In the present case, the statutory terms "property" and "includes" are unambiguously defined. As noted above, a court will not engage in statutory construction if the statutory language is unambiguous. *Collins*, 214 Ill. 2d at 214 (where the language of the statute is clear and unambiguous it will be applied as written, without resort to

extrinsic aids to statutory construction). See also 34 Ill. L. & Prac. *Statutes* §50 (2001) ("The purpose of all rules or maxims adopted by the courts for the construction or interpretation of statutes is to discover the true intent and meaning of the law. These rules or maxims are not rules of law, but are merely aids used by the courts in arriving at the real intention of the legislature when that intention is not clearly manifest from the language used. These rules are useful only in cases of doubt, and are never to be used to create a doubt, but only to remove it"). Thus, the maxim of strict construction has no application.

Similarly, the rule of lenity need not be employed. Under this canon of statutory construction, "penal statutes, where ambiguous, should be construed to afford lenity to the accused." *People v. Hicks*, 164 Ill. 2d 218, 222 (1995). In such a circumstance, the penal statute must be strictly construed in favor of the accused, with nothing taken by intendment or implication beyond the obvious or literal meaning of the statute. *People v. Laubscher*, 183 Ill. 2d 330, 337 (1998). Because section 15–1 is not ambiguous, there is no need for construction and the rule of lenity is not implicated.


The Requirement of Permanent Deprivation of Property

Having concluded that section 15–1 was intended to broaden the definition of property and that the use of a hotel room is property within the meaning of this statute, we turn to the separate question of whether such property may be the subject of theft by deception under section 16–1 of the Criminal Code.

Section 16–1(a)(2) provides that a person commits theft when he knowingly obtains control of the property of another by deception. 720 ILCS 5/16–1(a)(2) (West 2000). So long as one of the three required mental states is present, the crime of theft is complete. Defendant was charged under section 16–1(a)(2)(A), the intent "to deprive the owner permanently of the use or benefit of the property." 720 ILCS 5/16–1(a)(2)(A) (West 2000).

In addition to defining "property," section 15 defines other terms used in section 16–1(a)(2)(A). See 720 ILCS 5/15–2 (defining "Owner"); 15–3 (defining "Permanent Deprivation"); 15–4 (defining "Deception"); 15–8 (defining "Obtains Control") (West 2000).

The parties do not dispute that the hotel is the owner of the property, the meaning of the term "deception," or that defendant obtained control over the hotel room during the period of his occupancy. The question is whether, when the property at issue is the use of a hotel room, it is possible to permanently deprive the owner of its use or benefit. If not, defendant cannot be convicted under section 16–1(a)(2)(A) for its theft.

"Permanent Deprivation," as used in part C of the Criminal Code, means to:

"(a) Defeat all recovery of the property by the owner; or

(b) Deprive the owner permanently of the beneficial use of the property; or

(c) Retain the property with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return; or

(d) Sell, give, pledge, or otherwise transfer any interest in the property or subject it to the claim of a person other than the owner." 720 ILCS 5/15–3 (West 2000).

In the present case, only (a) or (b) are potentially applicable.

The State cites *People v. Collins*, 106 Ill. 2d 237, 261 (1985), in support of its argument that a rational trier of fact could have found that defendant intended to permanently deprive the hotel of the use or benefit of a leasehold interest. Because the trier of fact may deduce the intent to permanently deprive the owner of property " 'from the facts and circumstances surrounding the alleged criminal act' " (quoting *People v. Veasey*, 251 Ill. App. 3d 589, 591-92 (1993)), the State argues that the jury properly inferred that defendant intended permanent deprivation when he provided a false billing address and false trade references and made false promises to pay his bill. Thus, the State would treat the issue of permanent deprivation as a question of fact.

Defendant's position is that under section 16–1(a)(2), the thing that is taken by deception from the owner must not only be property within the meaning of 15–1, but must also be property of which the owner can be permanently deprived. Defendant states that he and his family:

-16-

"took over temporary use of a suite for a three-month period. ... They did not obtain *permanent control* over what the hotel owned, ... but rather they made use of hotel property, which was available for hire for about $130 per night. The hotel was thereby precluded from making the room available to any other lodger for each night in that period. But the hotel did not *permanently lose possession* of the suite or its rights thereto." (Emphases added.)

We agree with defendant that the question presented–whether the one who uses deception to obtain control of a hotel room for three months has permanently deprived the owner of the beneficial use of the property–is one of law. However, defendant is mistaken when he suggests that the statute requires permanent control by the defendant or permanent loss of possession by the owner.

The property at issue here is the use of a hotel room. The hotel's complement of rooms can be analogized to a store's inventory of goods. The hotel has a finite number of rooms, which it can rent to members of the public 365 nights each year. One night in one room is a thing of value. When this thing of value is taken by deception, the owner has permanently lost the benefit of one night's income. We, therefore, hold that each night of occupancy that is obtained by deception permanently deprives the owner of the beneficial use of the hotel room within the meaning of section 15–3(b) (720 ILCS 5/15–3(b) (West 2000)).

Defendant acknowledges that even though the hotel "was deprived of the rental value it should have received for the room on each of the nights" that he and his family occupied the suite, the record does not provide a basis to conclude that the suite would have been rented to another guest who would have paid at least $130 per night. He cites no authority for the proposition that in addition to proving that the value of the property involved exceeded $10,000 (720 ILCS 5/16–1(c) (West 2000)), the State has the burden of proving that the suite would have been occupied by a paying customer if defendant and his family had not been there.

It is well-settled law that the value of stolen property is the fair cash market value at the time and place of the theft. See, *e.g.*, *People v. Josephine*, 165 Ill. App. 3d 762, 764 (1987); *People v. Moore*, 109 Ill. App. 3d 874, 877 (1982); *People v. Brown*, 36 Ill. App. 3d 416

(1976). The rate of $130 per night negotiated by defendant was a discounted rate. The record supports a finding that the value of the stolen property exceeded $10,000.

Theft Versus Use of Property

Defendant also argues that he cannot be prosecuted under section 16–1 for the theft by deception of the use of a hotel room because that offense is codified at section 16–3(a) (720 ILCS 5/16–3 (West 2000)) and must be charged as such.

Section 16–3(a) provides:

> "A person commits theft when he obtains the temporary use of property, labor or services of another which are available only for hire, by means of threat or deception or knowing that such use is without the consent of the person providing the property, labor or services." 720 ILCS 5/16–3 (West 2000).

Violation of this section is punishable as a Class A misdemeanor. 720 ILCS 5/16–3(c) (West 2000).

The question of law which we must answer is whether the two offenses are mutually exclusive, or whether under the facts of this case, the State properly charged defendant under section 16–1. We begin with a comparison of the elements of the two crimes.

Section 16–1(a)(2)(A) requires that the defendant: (1) knowingly obtain control, (2) over the property of the owner, (3) by deception, (4) with the intent to permanently deprive the owner of the use or benefit of the property. The State must also prove (5) the value of the stolen property in order to establish the grade of the offense. 720 ILCS 5/16–1(b) (West 2000). Section 16–3(a) requires that he (1) obtain the temporary use of property, (2) that is available only for hire, (3) by threat or deception or knowing that the owner has not consented. 720 ILCS 5/16–3(a) (West 2000).

Each offense requires proof of one or more elements not required of the other. To convict a defendant of section 16–1 theft, the State need not prove that the property is available only for hire. To convict a defendant of section 16–3 theft, the State need not prove either the intent to permanently deprive the owner of the use or benefit of the property or the value of the property.

-18-

Nevertheless, defendant argues that the use of deception to obtain the temporary use of property that is available only for hire, such as a hotel suite, may be prosecuted *only* under section 16–3. He asserts that section 16–3 is "directed at precisely the sort of conduct" in which he allegedly engaged and that the legislature intended such conduct to be punished as a Class A misdemeanor. See *Davis*, 203 Ill. App. 3d at 844 (holding that section 16–3 did not apply to the defendants' conduct of diverting the labor of city employees to their own purposes because section 16–3 is "intended to protect businesses from the unscrupulous practices of prospective customers"). Defendant also calls our attention to the comment of the drafters of section 16–3:

> "This section codifies the 'temporary use' aspect of sections 300 (now ch. 71, §31) (hotels), 404b (customers list), 438 (commercial vehicle) and 439 (motor vehicle) of Ill. Rev. Stat. 1959, ch. 38." Ill. Ann. Stat., ch. 38, par. 16–3, Committee Comments–1961, at 218 (Smith-Hurd 1977) (Revised in 1970 by Charles H. Bowman).

The "section[ ] 300" referenced above was the first section of "An Act to define and punish frauds upon hotel, inn, boarding and eating-house keepers." The act was approved in 1889. That section provided:

> "[A]ny person who shall obtain food, lodging or other accommodation at any hotel, inn, boarding or eating house, with intent to defraud the owner or keeper thereof, shall be deemed guilty of a misdemeanor, and upon conviction, shall be punished by a fine not exceeding one hundred dollars or imprisoned in the county jail not exceeding thirty days." See Ill. Rev. Stat 1933, ch. 38, par. 300.

Defendant also points to the provisions of the Innkeeper Protection Act, which, although contained in the Code of Civil Procedure, parallels the language of section 16–3 of the Criminal Code:

> "Any person who, with intent to defraud, shall obtain lodging, food, money, property or other accommodations at a hotel, inn, boarding house or lodging house without paying therefor shall be guilty of a Class A misdemeanor. In case of

a second conviction of the offense described, the punishment shall be that provided for a Class 4 felony." 740 ILCS 90/5 (West 2000).

The Innkeeper Protection Act was in effect in Illinois as early as 1889 (1889 Ill. Laws 167). It was amended as recently as 1972 (Pub. Act 77–2529, §1, eff. January 1, 1973).

The State responds that sections 16–1 and 16–3 are not mutually exclusive, pointing to the drafters' comment that:

" 'Because of the special characteristics of the stolen commodity, and the practical problems of knowledge and intent involved, the theft of lost or mislaid property, and of labor, services or the use of property, are dealt with separately in sections 16–2 and 16–3. However it should be noted that these offenses are also Theft.

All other forms of theft are included in section 16–1 except the special deceptive practices proscribed by Article 17.' " *McCarty*, 94 Ill. 2d at 34, quoting Ill. Ann. Stat., ch. 38, art. 16, Committee Comments–1961, at 18 (Smith-Hurd 1977).

Thus, the State argues, if it can prove the elements of a section 16–1 theft, it may prosecute under that section, even if the property is available for hire and the defendant's conduct might otherwise meet the elements of section 16–3.

We conclude, for several reasons, that the State has the better argument. First, although the Innkeeper Protection Act and the forerunners of section 16–3 have been the law in Illinois for many decades, the legislature has not expressed any intent that these statutes are intended to be the exclusive basis for the prosecution of theft by deception of the use of a hotel room.

Second, the prosecutor has broad discretion in determining whether to charge an individual with a criminal offense and the nature of the offense to be charged. *Lyons v. Ryan*, 201 Ill. 2d 529, 539 (2002). Both this court and the United States Supreme Court have held that the prosecutor has the discretion to decide which of two offenses to charge where two different statutes prohibit the same criminal conduct but prescribe different punishments. *People v. McCollough*, 57 Ill. 2d 440, 443-44 (1974) (same set of facts may

constitute separate offenses under different statutes); *United States v. Batchelder*, 442 U.S. 114, 123-24, 60 L. Ed. 2d 755, 764, 99 S. Ct. 2198, 2204 (1979) ("when an act violates more than one criminal statute, the Government my prosecute under either so long as it does not discriminate against any class of defendants").

Where, as here, proof of theft under section 16–1 requires proof of elements not required under section 16–3, it is clear that the prosecutor has the exclusive discretion to decide which charge to bring. *People v. Jamison*, 197 Ill. 2d 135, 161-62 (2001); see also *People v. Barlow*, 58 Ill. 2d 41, 44 (1974) (when conduct violates more than one statute and the statutes require different proof or provide different defenses, a defendant is not denied equal protection of the law if he is prosecuted under the statute that provides the greater penalty).

Third, the structure of section 16–1 evinces a clear legislative intent that the theft of property of greater value is deserving of greater punishment than the theft of less valuable property. Thus, the person who, through deception, steals one night's occupancy at a discount motel is less culpable than the person who steals one night's occupancy in a penthouse suite at a four-star hotel. The person who, through deception, steals one night's stay at a hotel is less culpable than the person who stays for three months.

We note that under section 16–1(b)(1), "[t]heft of property not from the person and not exceeding $300 in value is a Class A misdemeanor." 720 ILCS 5/16–1(b)(1) (West 2000). Similarly, any section 16–3 theft is a Class A misdemeanor. If the value of the hotel stay is under $300, both statutes yield the same result and the State may choose, as a matter of prosecutorial discretion, to proceed under 16–3 because this charge is more easily proven. On the other hand, if the value of the hotel stay is greater than $300, and if the State can prove the additional elements, it may choose to proceed under section 16–1.

Defendant's Request for Cross-relief

In a portion of the appellate court opinion unpublished under Supreme Court Rule 23 (No. 2–04–0398 (unpublished under Supreme Court Rule 23)), the appellate court considered and rejected

defendant's claim of ineffective assistance of counsel at trial. He renews his arguments before this court.

We note that defendant filed *pro se* posttrial motions raising claims of ineffective assistance of counsel and, after dismissing both the privately retained attorney who represented him at trial and the public defender appointed to represent him in posttrial proceedings, represented himself at the hearing on the matter. On more than one occasion, the trial court warned defendant of the risk of procedural default. Thus, any failure to preserve a specific claim of ineffective assistance in a posttrial motion must be attributed to defendant himself, not to counsel. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must both make a contemporaneous objection and raise the matter in a posttrial motion). His failure to preserve an issue in one of his posttrial motions is not corrected by the efforts of the appellate defender to raise the issue before the appellate court or in a brief to this court. As we observe below, some of the issues raised in defendant's brief are arguably procedurally defaulted. We, nevertheless, choose to address those issues because the State has not argued default.

With this background in mind, we turn to defendant's allegations of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that: (1) counsel's representation was so deficient as to fall below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance so prejudiced defendant as to deny him a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). This means the defendant must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the "counsel" guaranteed by the sixth amendment. In addition, defendant must prove there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005). If either prong of the *Strickland* test is not met, defendant's claim must fail. Thus, a reviewing court need not consider whether counsel's performance was deficient before determining

whether the defendant was so prejudiced by the alleged deficiencies that he is entitled to a new trial. *People v. Alvine*, 173 Ill. 2d 273, 293 (1996).

## Hearsay Statements

In one of his posttrial motions, defendant stated: "The Court erred in allowing hearsay testimony in." The motion asserted that the State's Attorney made a hearsay statement regarding statements of the Lombard police officer who investigated the hotel's complaint, but it does not quote the alleged hearsay statement or describe when or under what circumstances the statement was made by the officer or referred to by the prosecutor. No other specific instances of hearsay testimony were identified. During his cross-examination of attorney Wolfe, defendant did not question him about his decisions regarding objections to any alleged hearsay statements. Defendant did not make any argument on this issue to the trial court during the posttrial proceedings.

With the assistance of the appellate defender, defendant now argues that defense counsel failed to object to certain hearsay statements in the testimony of the hotel's general manager and assistant general manger and that he compounded the error by eliciting further details of the hearsay on cross-examination. The two managers testified regarding telephone conversations with the vendors listed by defendant as trade references and with the individual defendant had identified as the contact person for Prolific. They testified that the vendors gave negative reports about defendant and that the purported contact at Prolific denied any connection to defendant or his company. Defendant asserts that these statements were hearsay because they were out-of-court statements offered for the truth of the matters asserted and that these statements would have been excluded had counsel objected. In addition, defendant argues that testimony that the words "Address Unknown" appeared on the envelope returned by the post office also constituted inadmissible hearsay.

These claims could be deemed procedurally defaulted by defendant because he failed to raise them in his posttrial motion and in his argument to the trial court during the hearing that was held for the purpose of considering his claim of ineffective assistance of counsel.

The State overlooks default and argues that these statements were not hearsay because they were not offered for the truth of the matters asserted. The State was not attempting to prove that defendant owed money to one of this trade references, or that he did not have a valid account with the other. The State was not trying to prove that the purported contact person was not affiliated with Prolific, or that the address provided by the defendant was inaccurate. Rather, each of these statements was offered as evidence of defendant's intent to deceive. The State further asserts and that even if these statements were hearsay, defense counsel's decision not to object was a matter of trial strategy.

The appellate court reasoned that the out-of-court statements would not serve as evidence of intent to deceive unless they were true. The appellate court thus concluded that the challenged statements were, indeed, hearsay, but that counsel's choice not to object was a matter of trial strategy because an objection might have prompted the State to call the individuals who made the statements and their testimony might have proven even more damaging to defendant than the hearsay statements themselves.

Defendant responds that "the record provides no indication that the State was prepared" to offer the testimony of a postal official, representatives of the purported trade references, or the individual who denied being defendant's business associate. Thus, he claims, it cannot have been a matter of trial strategy to forgo objecting to the hearsay testimony.

This court has noted on several occasions that decisions regarding "what matters to object to and when to object" are matters of trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997); *People v. Graham*, 206 Ill. 2d 465, 478-79 (2003). We have also made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight. *People v. Madej*, 177 Ill. 2d 116, 157 (1997).

Thus, in *Graham*, this court rejected a claim of ineffective assistance of counsel based on counsel's failure to object to the admission of a witness' prior consistent statement to bolster his trial testimony. We noted that counsel's decision not to object was a

"strategic choice" that did not fall below an objective standard of reasonableness. *Graham*, 206 Ill. 2d at 478-79.

In *People v. Evans*, 209 Ill. 2d 194, 220-21 (2004), the assistant State's Attorney read portions of the defendant's court-reported statement to the jury. In his statement, the defendant mentioned having been involved in "other incidents." He argued on appeal that the mention of "other incidents" was inadmissible evidence of other crimes and that defense counsel was ineffective for failing to object. We observed that it was "highly possible that defense counsel allowed the statement to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement." *Evans*, 209 Ill. 2d at 221. We further noted that defense counsel's failure to object to testimony "may be a matter of sound trial strategy, and does not necessarily establish deficient performance." *Evans*, 209 Ill. 2d at 221.

We agree with the appellate court that it is entirely likely counsel chose to let these statements pass rather than object and run the risk of the declarants themselves being called to testify. If these individuals had been put on the stand, they may have offered even more damaging evidence. In fact, the transcript of the posttrial hearing testimony of defense counsel clearly demonstrates that he declined to call several of the witnesses defendant wished to call because they would have given testimony damaging to the defense. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005) (whether to call a particular witness is a matter of trial strategy and such decisions generally will not support a claim of ineffective assistance of counsel). In addition, we reject defendant's argument that the record must reflect that the State was "prepared to present" these other potential witnesses because he offers no authority for this proposition.

We conclude, therefore, that defendant has not demonstrated that defense counsel's decision not to object to these statements constitutes deficient performance under the objective test of *Strickland*.

Prosecutor's Closing Argument

Defendant's *pro se* posttrial motions cited several cases addressing the issue of improper comment by prosecutors, but did not apply these

cases to the facts of his own case. The motions contained conclusory statements such as: "The State's closing arguments were false, misleading, and deliberately prejudicial." He also alleged that defense counsel "failed to object to several improper comments by the prosecutor in closing argument." A thorough review of defendant's *pro se* filings and his argument at the motion hearing reveals that he did identify several specific statements that, in his opinion, defense counsel should have objected to during closing argument. These statements are the prosecutor's assertions that: (1) he is not a "businessman"; (2) he had no income or prospect for income when he registered at the hotel; (3) he is a "conman," a "fraud," and a "fake"; (4) he provided credit card information to the hotel that was not valid; and (5) all charges made to the credit card were reversed when, in fact, approximately $500 in charges were accepted.

Before this court, defendant argues that he was "unfairly disparaged" by the prosecutor, who also "portrayed the State's evidence as being stronger than was actually the case," and that defense counsel's failure to object constituted deficient performance. He identifies four such statements. First, the prosecutor stated that defendant had no income or real prospect for income at the time he registered as a guest at the hotel. Second, the prosecutor stated that defendant left the hotel in the middle of the night without settling his bill and was never seen again. Third, at the beginning of his rebuttal, the prosecutor called defendant a "conman," a "fraud," and a "fake." Finally, the prosecutor concluded her rebuttal with the statement: "Don't let Michael Perry deceive you."

Defendant objects to the statements regarding his financial status and his nighttime departure from the hotel on the basis that they lack evidentiary support. Defendant asserts that defense counsel should have objected to the first statement because there had been no testimony about his "overall financial status" and that he had, in fact, been able to pay for the initial part of his stay using credit cards. As for the second statement, he argues that defense counsel should have objected because the "record simply does not support any inference of a surreptitious mass departure by dark of night." The third statement is, he claims, improper disparagement. The fourth statement is described as an improper accusation that defendant was attempting

to deceive the jury to obtain an acquittal to which counsel should have "vehemently objected."

Although the specific statements to which defendant is now objecting are not precisely the same statements that he mentioned in his posttrial motions, we conclude that he has adequately preserved this issue and, as a result, our analysis will be guided by the *Strickland* factors.

The appellate court concluded that the statements were not improper, so the lack of an objection by defense counsel was not deficient performance.

In general, prosecutors have wide latitude in the content of their closing arguments. *Evans*, 209 Ill. 2d at 225. The prosecutor may comment during closing argument on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks. *Evans*, 209 Ill. 2d at 225. A reviewing court will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error. *Johnson*, 218 Ill. 2d at 141. Thus, in order to meet the prejudice prong of the *Strickland* test, defendant must make the same showing–that real justice was denied or that the verdict resulted from counsel's failure to object.

We note that prior to closing arguments, the trial court instructed the jury that "[l]ike opening statements, closing arguments are not evidence and any statement or argument that is made by the attorneys which is not based on the evidence or reasonable inferences to be drawn from the evidence should be disregarded." See *Nicholas*, 218 Ill. 2d at 122-23 (brief reference to defendant as "pure evil" did not require new trial where the comment was not repeated and where the trial court preemptively cautioned the jury to disregard argument not based on the evidence); *People v. Ceja*, 204 Ill. 2d 332, 357-58 (2003) (comments overstating the evidence did not deny defendant a fair trial where thee comments were brief and where the trial court instructed the jury to ignore statements made in closing argument that were not based on the evidence).

During his closing argument, defense counsel repeatedly referred to defendant as a "businessman" who, during his stay at the hotel, was working on a real estate deal. Counsel summarized the testimony describing the details of the deal and why the deal collapsed, leaving defendant unable to pay his hotel bill. Counsel called the jury's attention to evidence of defendant's having notified the hotel as early as May 7 that he intended to check out on May 13, which, he argued, countered the suggestion that defendant left the hotel surreptitiously during the night.

Our review of the record reveals that there was sufficient evidentiary support for the prosecutor's characterization of defendant's business prospects and the circumstances under which he left the hotel. Defense counsel's decision to address these comments by counterarguement rather than by objection was, thus, a matter of sound trial strategy. Given the trial court's admonition to the jury and defense counsel's counterargument, we conclude that the lack of objection to these statements was not deficient performance by defense counsel.

Defendant also argues that in her rebuttal argument, the prosecutor engaged in name-calling in an effort to prejudice the jury and that defense counsel's failure to object was another example of deficient performance. Specifically, the prosecutor opened her rebuttal argument with the statement: "Conman. Fraud. Fake. It's Michael Perry." Defendant cites *People v. Johnson*, 119 Ill. 2d 119, 139 (1987), for the proposition that a prosecutor should not engage in inflammatory name-calling to arouse the passions of a jury against a defendant.

In *Johnson*, the prosecutor described the defendant, who was accused of a brutal murder, as an "animal" who "butchered" four persons. This court observed that calling a defendant an "animal" is improper "even where that characterization is based on the evidence" (*Johnson*, 119 Ill. 2d at 139), because the term is inflammatory and prejudicial. Nevertheless, this court did not find reversible error. The trial court had specifically instructed the jury to disregard any statements made during closing arguments that were not based on the evidence. In addition, the remark was "isolated" and "not dwelled upon further by the prosecutor." *Johnson*, 119 Ill. 2d at 140.

Defendant also attacks the prosecutor's "name-calling" on the grounds that it suggested to the jury that he had engaged in deceptive behavior in the past. He argues that it is improper for the State to suggest that a defendant has engaged in similar conduct on other occasions, relying on this court's decision in *People v. Whitlow*, 89 Ill. 2d 322 (1982). In *Whitlow*, the prosecutor made references to background of one of the defendants in violation of an order *in limine*, including a comment that " '[m]aybe this time he will get caught.' " *Whitlow*, 89 Ill. 2d at 340. The prosecutor also asked the jury the rhetorical question, " 'How many other corporations was he using? How many other shareholders? How much more money was he taking ***?' " *Whitlow*, 89 Ill. 2d at 340. Based on the cumulative effect of these and other comments, this court found reversible error. *Whitlow*, 89 Ill. 2d at 343.

In the present case, the prosecutor described defendant as a "conman," "fraud," and "fake" only in the opening sentence of her rebuttal. This was an isolated remark that introduced the argument that the evidence showed defendant had deliberately deceived the hotel. See *Nicholas*, 218 Ill. 2d at 122 (prosecutor's calling defendant "pure evil" merely prefaced his argument that the facts proved defendant guilty; these facts included defendant's getting a gun, hunting his mother in the street, shooting her four times, hiding the gun, going back to bed, and displaying little concern about her death).

In addition, as in *Johnson*, the jury was properly instructed to disregard any statement made during closing argument that was not supported by the evidence. The prosecutor did not suggest to the jury that defendant had a history of engaging in theft or fraud. Describing a defendant who is charged with theft by deception as a conman, fraud, or fake is similar to describing a defendant who is charged with murder as a killer or a murderer. The label does not necessarily imply a pattern of similar behavior. We, therefore, conclude that defendant would not have been be entitled to a new trial based on the prosecutor's comment and that, therefore, counsel's failure to object cannot have caused the type of prejudice necessary under *Strickland*.

The last comment that defendant challenges was made by the prosecutor at the close of her rebuttal argument. She said: "Don't let Michael Perry deceive you. Find him guilty of theft by deception." Defendant characterizes this comment as a suggestion to the jury that

he or his counsel was attempting to deceive, trick, or confuse the jury to obtain an acquittal. He cites *People v. Emerson*, 97 Ill. 2d 487 (1983), in which a new trial was granted in a capital murder case on the basis of multiple instances of prosecutorial misconduct. In *Emerson*, this court found reversible error where, among other things, the prosecutor suggested that defense counsel laid down a smokescreen " 'composed of lies and misrepresentations and innuendoes,' " and that he, like all defense attorneys, tried to "dirty up the victim." *Emerson*, 97 Ill. 2d at 497.

The statement in the present case, even if improper, is readily distinguishable from the pattern of inflammatory and prejudicial statements that resulted in a new trial for the defendants in *Emerson*.

In any event, defendant confines his argument on the issue of prosecutorial comments to the first prong of the *Strickland* test. He argues that "by failing to object when the prosecutor disparaged Mr. Perry before the jury, trial counsel failed to provide proper representation," but he makes no colorable argument that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. We conclude that, with respect to each of the asserted instances of improper comment by the prosecutor, counsel's performance was either not deficient or, even if deficient, did not result in prejudice to defendant that would require a new trial.

Trial Court's Answer to Jury Question

The jury was initially instructed on the meaning of the phrase "permanent deprivation" according to Illinois Pattern Jury Instruction, Criminal, No. 13.33B (4th ed. 2000), which is virtually identical to the statutory definition of the term (720 ILCS 5/15–3 (West 2000)). During deliberations, the jury sent out a note asking, "In this case, what exactly does 'deprive the owner permanently' mean?" Defense counsel did not object when the trial court indicated its intent to utilize the dictionary definition of "permanently" to fashion its response: "The intent to deprive the owner permanently means the intent to not pay back or the intent not to return." However, the trial court's written response that was actually given to the jury did not contain the definition to which defense counsel had agreed. Instead, the trial

court's written response said only: "The intent to 'deprive the owner permanently' means the intent to deprive."

Defendant's *pro se* motion alleged that the trial court "erred in rendering a definition of the meaning of 'permanently deprive' in response to a jury question." Defendant did not claim that defense counsel was ineffective with regard to the court's response to the jury question. This issue could be deemed procedurally defaulted for failure to preserve it in a posttrial motion.

Defendant now argues that defense counsel was "responsible for and complicit in" the trial court's giving a "meaningless incomplete response" to the jury's question.

We conclude that defendant cannot prevail on this claim because, even if trial court's written response to this jury question introduced error, the error is attributable to the trial court, not to ineffective assistance by defense counsel. Similarly, even if the response that defense counsel agreed to would have been improper, his agreement to the court's proposed answer cannot have prejudiced defendant because that answer was never given to the jury.


Defense Theory of the Case

In his *pro se* posttrial motions, defendant claimed that defense counsel "failed to develop a coherent theory of defense." In support of this claim, defendant listed numerous questions that he thought should have been put to various witnesses. He named several individuals who, in his opinion, should have been subpoenaed to testify for the defense and asserted that he had given these names to counsel prior to trial. These included members of the hotel staff who would testify that he was a generous tipper and that he and his wife treated them with "generous benevolence." He accused counsel of failing to subpoena the personnel files of hotel employees to discover any instances of disciplinary action and of failing to subpoena records from other hotels that he and his family had stayed at in the past. He also claimed that counsel was ineffective for failing to investigate the Lombard police department. Finally, defendant stated that counsel was ineffective for failing to file various motions that defendant requested "and gave the case numbers for reference." The requested motions

included a motion to dismiss a frivolous complaint, a motion to dismiss indictment, and a motion to dismiss for malicious prosecution.

The appellate court resolved this issue by noting that defendant "failed to show that any mitigating evidence was indeed available" and, thus, he had "no evidence to support his claim" that counsel failed to investigate or prevent favorable evidence." Although the trial court and the appellate court both found these claims to lack merit, he has properly preserved these issues for review under *Strickland*.

Before this court, defendant claims that the dispute between himself and the hotel was entirely a civil matter involving breach of contract and an unpaid debt. Defendant argues further that defense counsel was ineffective for failing to present available evidence that would have bolstered his theory of the case and countered the State's evidence against him. The "available evidence" that defendant refers to is a brochure from HG Global Workplaces, which describes "flexible turn-key officing solutions" available at the address defendant provided to the hotel for his company, Prolific Development Corporation. The brochure states that HG Global provides a mailing address and other facilities to small or virtual businesses. According to defendant, "defense counsel could have subpoenaed records and a representative of HQ Global to authenticate the existence of a business address for Prolific Development Corporation and explain its office status." He asserts that the address he provided to the hotel was not fraudulent, but was "a legitimate business mailing address, at least at some point." Further, counsel "could have shown the defendant's claim to hotel personnel that he was having trouble with mail delivery to be more plausible, rather than leaving it for the jury to believe that the address did not exist." This is the only specific example offered in defendant's brief of defense counsel's alleged failure to make reasonable efforts to counter the State's case.

The State responds that defense counsel's decisions regarding what documentary evidence to subpoena and which witnesses to present are matters of trial strategy and that these decisions ultimately rest with defense counsel, citing *People v. West*, 187 Ill. 2d 418, 432 (1999) (decisions concerning which witnesses to call and what evidence to present are matters of trial strategy and are generally immune from claims of ineffective assistance of counsel).

The trial court heard the lengthy testimony of defense counsel at the posttrial hearing and clearly found his testimony to be credible.

Defense counsel testified that he based his decision on what witnesses to call on whether the defense "would get nothing but positive response from those witnesses, relative to the theory of our defense." He stated that his conversations with several of the witnesses suggested by defendant revealed that "it would not have been beneficial to [defendant] to subpoena certain witnesses on that list." He concluded that the risk of having those witnesses testify about their dealings with defendant "outweighed the probative value."

Defense counsel also testified that he called the only two witnesses whose testimony he expected to be useful in establishing the defense theory. These two individuals testified that they were in business with defendant and that he reasonably anticipated that the deal he was working on during the time he was staying at the hotel would be profitable and would enable him to pay the hotel what he owed. Counsel also stated that he declined to call other suggested witnesses, such as the hotel's van driver, because their testimony would be "peripheral to the theory of the defense." He decided not to subpoena information from other hotels at which defendant had stayed because he had learned from defendant's prior attorney that "there had been a bill left outstanding when Mr. Perry vacated" one of those hotels, and that he would be opening a "Pandora's box," if he made an issue of defendant's previous lengthy hotel stays. He did not subpoena documents regarding the mailing address for Prolific because he did not think that the defense needed to establish the status of the company in order to raise the defense that defendant did not engage in deceit because he intended to pay the hotel, but was simply unable to do so because of a business deal that fell through.

Based on our review of the trial transcript and of the transcript of the hearing on defendant's posttrial motions, we conclude that he has failed to meet his burden of demonstrating that defense counsel's decisions regarding witnesses and documentary evidence were not within the realm of trial strategy. *People v. Enis*, 194 Ill. 2d 361, 378 (2000).

Further, even if defense counsel makes a mistake in trial strategy or tactics or an error in judgment, this will not render representation constitutionally defective. *West*, 187 Ill. 2d at 432-33. Only if counsel's trial strategy so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective

assistance of counsel be found. *West*, 187 Ill. 2d at 432-33. This is not such a case.

Cumulative Error

Defendant briefly alludes to *People v. Vera*, 277 Ill. App. 3d 130, 141 (1995), for the proposition that the errors made by defense counsel should be "viewed cumulatively" to determine whether a defendant is entitled to a new trial as a result.

We have rejected defendant's claims of ineffective assistance of counsel, concluding that counsel's performance was not deficient or, even if deficient, did not result in prejudice under *Strickland*. Because we have rejected every claim of error, cumulative-error analysis is not necessary.

CONCLUSION

In sum, we hold that the occupancy of a hotel room is "property" within the meaning of section 15–1 of the Criminal Code and that the taking of such property by deception can result in the owner's being permanently deprived of its use or benefit. We further hold that the offenses defined in sections 16–1 and 16–3 are not mutually exclusive and that, in the present case, the State properly charged the defendant with theft under section 16–1. Because these questions of law are resolved against the defendant and because a rational trier of fact could have found that defendant intended to permanently deprive the hotel of the use or benefit a suite of rooms (*Collins*, 106 Ill. 2d at 261), we reverse the judgment of the appellate court as to defendant's conviction of theft.

We further hold that defendant is not entitled to a new trial on the basis of ineffective assistance of counsel.

The judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE FITZGERALD, dissenting:

I respectfully dissent because I believe the legislature was careful to exclude the mere "use" of property from the definition of "property" in section 15–1. 720 ILCS 5/15–1 (West 2000). That section defines "property" to mean "anything of value." It includes: money, food and drink, real estate, fixtures, telecommunications services, electricity, gas, water, tickets, documents, photographs, computer programs, drawings, models, commercial instruments, and "written instruments representing or embodying rights concerning anything of value, labor, or services, or otherwise of value to the owner." 720 ILCS 5/15–1 (West 2000). Notably, the statutory definition of property does not cover labor or services themselves, only written instruments embodying the rights to such services. This definition also does not include the right to temporarily use property. Therefore, the defendant cannot be found guilty of theft by deception of the use of a hotel room under section 16–1 (720 ILCS 5/16–1 (West 2000)).

I further disagree with several points in the majority's reasoning. In support of its holding, the majority states,

> "The phrase 'anything of value' is unambiguous. Clearly, the legislature intended to expand the definition of property to include not only items of tangible personal property but also other things of value such as real estate, electricity, and telecommunications services. The hospitality industry provides lodging to the public for profit. The market for hotel and motel rooms is vast. The use of a hotel room does have value. See *Moline Water Power*, 252 Ill. at 357 [1911] (stating that water power is property because it 'is bought and sold in the market as freely as the products of the farm'). We conclude that the use of a hotel room is a thing of value as that phrase is used in the first sentence of section 15–1." Slip op. at 10-11.

I first disagree that the phrase "anything of value" unambiguously supports the majority's holding. I believe my interpretation above at least renders the phrase "anything of value" ambiguous. The majority opinion ignores the underlying premise of the sole citation for this proposition. The premise of this statement in *Moline Water Power* was that one buys and sells the ownership of the electricity in the market, not the right to temporarily use that electricity. In other

-35-

words, it is not the *rental* of these things which is "bought and sold on the market"; it is the thing itself.

The majority further emphasizes that it is a night of occupancy that was the "use" of the room which was permanently lost, explaining,

> "The property at issue here is the use of a hotel room. The hotel's complement of rooms can be analogized to a store's inventory of goods. The hotel has a finite number of rooms, which it can rent to members of the public 365 nights a year. One night in one room is a thing of value. When this thing of value is taken by deception, the owner has permanently lost the benefit of one night's income. We, therefore, hold that each night of occupancy that is obtained by deception permanently deprives the owner of the beneficial use of the hotel room within the meaning of section 15–3(b) (720 ILCS 5/15–3(b) (West 2000))." Slip op. at 17.

By continuing to equate the mere "use" of a hotel room with a "store's inventory of goods" the majority continues to ignore the distinction between rental, in which the owner allows another temporarily to possess a thing, and the sale of a thing, where ownership of the thing itself changes hands. The leap of logic in the majority's analogy is that a store is not in the habit of renting its inventory of goods for temporary use. Because the failure to recognize this distinction, I believe the majority has made an unwarranted expansion of section 15–1 of the statute beyond the legislature's intention.

Moreover, it is unclear that the Embassy Suites would have otherwise obtained the money for the night's lodging used by defendant. The majority cites no specific evidence that defendant denied the hotel the opportunity to rent the room to another customer. Further, there is no basis to conclude that there were any nights when the hotel was full and another party would have taken the suite. In this context, the mere opportunity that the hotel might have had to take in other money for the suite cannot be found to constitute "property" for purposes of the general theft statute.

The majority's expansive interpretation is problematic for several other reasons. First, tenants and landlords could potentially apply the court's reasoning concerning "use" to criminalize breaches of leases. Commentators have criticized similar approaches because of "the

possibility of theft prosecutions in cases of holdover or eviction in a landlord-tenant relationship" and the "problem *** of distinguishing between theft and criminal trespass." Model Penal Code §223.2, Comment, at 173-74 (1980). Commentators also state that obstacles to theft prosecution in these situations makes sense, for "the immobility and virtual indestructibility of real estate makes unlawful occupancy of land a relatively minor harm for which civil remedies supplemented by mild criminal sanctions for trespass should be adequate." Model Penal Code §223.2, Comment, at 172 (1980). Furthermore, "Relations between a landlord and a tenant are so minutely regulated and constitute such a delicate socio-political problem that it would be wrong to introduce the possibility of a theft prosecution for unauthorized occupancy by a tenant or improper eviction by a landlord." Model Penal Code §223.2, Comment, at 172 (1980).

These criticisms may explain the lack of even one prior appellate court decision which has found that the mere "use" of property for a period of time constitutes "property" under section 15–1. Previous cases have only implicitly found that leaseholds constituted property under section 15–1 and have not provided an iota of analysis on the issue. See *People v. Hagan*, 199 Ill. App. 3d 267 (1990) (where the appellate court overturned a conviction of attempted theft by deception of a commercial lease, but did not address whether a lease was property under section 15–1); *People v. Veasey*, 251 Ill. App. 3d 589 (1993) (where the appellate court upheld a conviction of theft by deception of a car lease, but similarly did not specifically address whether the right to temporarily use the car constituted "property" under the statute). Therefore, this court will be the first to hold that this type of "use" is "property" under section 15–1, and thus the first to apply the theft-by-deception concepts to landlord-tenant law.

My research has revealed only one case that has, albeit implicitly, supported my interpretation over the majority holding. In *People v. Mattingly*, 106 Ill. App. 2d 74 (1969), a tenant signed a lease and paid a security deposit to the landlord. Upon arriving on the first day of his tenancy, the tenant found that other persons were already occupying the premises. The landlord was subsequently convicted of theft by deception of the security deposit. In reversing the conviction, the court found that the failure of the landlord to deliver possession would not terminate the lease and the tenant would have the right to gain

possession from the occupants by suit in forcible detainer. Accordingly, the landlord had a right to control the security deposit until the termination of the lease. The fact that others occupied the premises when the tenant was to take possession did not entitle the tenant to demand a portion of the security deposit which he had paid. Thus, the landlord's refusal to return that portion of the security deposit did not constitute theft by deception. Therefore, the court reversed the landlord's conviction.

Significantly, the *Mattingly* court focused only on the money that remained in the hands of the landlord as being the "property" subject to theft, rather than focusing on the *use* of the premises which the landlord denied the tenant. This is because the court found that the lease was still in effect until the tenant had gained the right to possession by a suit in forcible detainer. Yet, the majority is overturning *Mattingly, sub silentio*, making the deceptive taking of the tenant's contractual right to the "use" of the premises illegal, and subjecting the landlord to a theft conviction. The implications of the majority's reasoning are therefore squarely applicable to typical landlord-tenant situations. Consider three common, hypothetical cases.

The first situation is the typical failure of a landlord to provide habitable rental property, even for a short period of time. For instance, a landlord may lack the money or desire to sufficiently winterize the building. Nevertheless, the landlord accepts rent from various tenants in the building, knowing full well that the facilities to provide the building's heat and hot water are inadequate. But he decides to wait until the facilities actually break down in the dead of winter before he fixes the problem. Consequently, the landlord has denied the tenants the benefit of their bargain. The tenants have lost their contractual right to "use" of the apartment, and also the opportunity to rent another apartment before the onset of winter. Some tenants may even have lost sub-rental income. Under normal circumstances, the landlord would be subject to civil remedies such as a suit by the municipality seeking an injunction to repair the property, and for fines for ordinance violations, or a tenant's suit directly against the landlord for whatever value that the property has been diminished. Following the majority's reasoning, however, the landlord has committed a theft because he consciously deprived the tenants of their rightful "use" of the property to which the tenant's were entitled under the lease.

Depending on the number of apartments in the building, the number of days deprived, and the degree to which the building was without heat, the landlord could also be liable for theft by deception and a Class 2 felony (720 ILCS 5/16–1(a)(2) (West 2000)). The tenant's right to "use" of the property is clearly a "thing of value" to them, making the landlord guilty of theft by deception.

Perhaps clearer is a typical "self-help" eviction. A tenant has not paid rent for three months. Instead of initiating a proceeding for forcible entry and detainer, the landlord deliberately changes the locks on the tenant's apartment, permanently barring the tenant from the property. Because the tenant still retains the right to the "use" of the property for the remainder of the lease, a landlord would be guilty of theft of the tenant's right to "use" the property under the lease.

The third case is one of a holdover tenant. The family's breadwinner has lost his job and is unable to pay rent. The family knows that it is unlikely or unwilling to pay the arrears on the rent and holds out in the apartment until the landlord institutes civil proceedings for forcible entry and detainer. The family avoids the landlord and deprives the landlord of his ability to rent the property to another tenant. Under all normal circumstances, the legislature has given the tenant the benefit of civil legal processes of forcible entry and detainer, which begins with a five-day notice, service of process, and, eventually, a day in court. Thus, the tenant has the legal right to "use" the premises until a court finds that the landlord has the right of possession. This opinion theoretically entitles the landlord to submit a complaint for prosecution upon the tenants for a felony offense punishable by six years in prison in lieu of or in addition to the normal course of civil proceedings. I do not know what the deleterious effects of this additional remedy may be, but I believe that it is best considered by the legislature.

Next, this decision implicates the legislative judgment not to criminalize ordinary cases sounding in contract. I believe the legislature should act with caution in imposing criminal penalties on a hotel guest, landlord, tenant, or any party which has the right to "use" property where contractual remedies remain available. As Judge Posner has stated,

> "[U]nder the common law (including the common law of Illinois ***), a breach of contract is not considered wrongful activity in the sense that a tort or a crime is wrongful. When

we delve for reasons, we encounter Holmes's argument that practically speaking the duty created by a contract is just to perform or pay damages, for only if damages are inadequate relief in the particular circumstances of the case will specific performance be ordered. In other words, and subject to the qualification just mentioned, the entire practical effect of signing a contract is that by doing so one obtains an option to break it. The damages one must pay for breaking the contract are simply the price if the option is exercised. See Oliver Wendell Holmes, Jr., *The Common Law* 300-02 (1881); Holmes, 'The Path of the Law,' 10 *Harv. L. Rev.* 457, 462 (1897).

Why such lenity? Perhaps because breach of contract is a form of strict liability. Many breaches are involuntary and so inapt occasions for punishment. Even deliberate breaches are not necessarily culpable, as they may enable an improvement in efficiency ***. *** The option of which Holmes spoke was the option not to perform because performance was impossible or because some more valuable use of the resources required for performance arose after the contract was signed." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 389-90 (7th Cir. 2002).

Here, the hotel seeks criminal punishment because of the inability, at least initially, to screen out defendant as a customer and thereafter to be made whole through adequate contractual remedies. Further, defendant's theft of the "use" of the hotel property could also simply be characterized as a breach of his duty to pay under the contract. The holding today calls into question whether a person who deliberately breaches a contract may also be subject to significant criminal penalties.

Lastly, the legislature has already addressed the concerns in other statutes. In these provisions, the legislature has specifically outlawed the act of unlawfully using a hotel by employing words such as "use," "lodging," or "accommodations." The legislature has prohibited defendant's behavior in section 16–3(a) (720 ILCS 5/16–3(a) (West 2000)), which is a Class A misdemeanor. This provision states, "(a) A person commits theft when he obtains the temporary use of property, labor or services of another which are available only for hire, by means of threat or deception or knowing that such use is without the consent

of the person providing the property, labor or services." 720 ILCS 5/16–3(a) (West 2000). Second, the Innkeeper Protection Act (740 ILCS 90/5 (West 2000)) also specifically prohibits this action, and also is a Class A misdemeanor for the first offense. This provision states, "Any person who, with intent to defraud, shall obtain lodging, food, money, property or other accommodation at a hotel, inn, boarding house or lodging house without paying therefor shall be guilty of a Class A misdemeanor. In case of a second conviction of the offense described, the punishment shall be that provided for a Class 4 felony." 740 ILCS 90/5 (West 2000). I deduce from these examples that the legislature could have explicitly employed words such as "accommodation," "lodging," or "use" of property in its definition of "property" in section 15–1. This demonstrates that the legislature has explicitly intended that defendant's behavior receive punishment as a Class A misdemeanor. Therefore, defendant's behavior will not go unpunished had the court ruled that the "use" of a hotel room is not "property" within section 15–1 (720 ILCS 5/15–1 (West 2000).

Because of the foregoing reasons, I respectfully dissent.

JUSTICE KILBRIDE joins in this dissent.