2020 IL App (1st) 170756-U

THIRD DIVISION
December 16, 2020

No. 1-17-0756

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 21742 |
| | ) | |
| STANLEY KIRKMAN | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*:   First-stage dismissal of post-conviction petition affirmed. Defendant failed to state gist of claim that direct-appeal counsel was ineffective for failing to challenge pre-indictment delay and corresponding denial of due process.

¶ 2     After a jury convicted defendant Stanley Kirkman of aggravated criminal sexual assault, the post-trial proceedings took up the question (among others) whether pre-indictment delay impaired his ability to present his defense and thus denied him due process. To this end, post-trial counsel moved to dismiss the indictment and alleged, in a motion for new trial, that trial counsel was ineffective for failing to do so in the first instance. Either way, the key questions were whether four prospective defense witnesses who did not testify were rendered unavailable by the pre-indictment delay, and whether their absence caused actual and substantial prejudice to

the defense. The trial court denied both motions, and those rulings were not challenged on direct appeal. In his post-conviction petition, defendant alleged (among other claims) that counsel on direct appeal was ineffective for that reason. The circuit court dismissed the petition at the first stage. We affirm.

¶ 3                                    BACKGROUND

¶ 4      The full details of the underlying sexual assault and defendant's trial are set forth in our decision on direct appeal. See *People v. Kirkman*, 2016 IL App (1st) 131475-U, ¶¶ 9-81. Here, we recount only those facts, procedural and substantive, that are necessary to understand the limited issue of pre-indictment delay now before us.

¶ 5                              I. Overview and Timeline

¶ 6      On July 8, 1999, a naked, 15-year-old M.C. ran into the parking lot of a police station and reported that she was just sexually assaulted at gunpoint, in a nearby alley, by a stranger who had verbally taunted her in the area a few days earlier. Vaginal and rectal swabs were taken from M.C. at West Suburban Hospital. Semen was detected in the rectal swab but not in the vaginal swab. The Combined DNA Index System (CODIS) did not yield a match for the rectal swab at the time. And no suspects emerged on any other grounds.

¶ 7      More than six years later, on December 20, 2005, defendant's DNA profile was entered into CODIS, pursuant to his March 30, 2005 conviction for vehicular hijacking. The profile was a match for M.C.'s rectal swab. On October 3, 2007, M.C. identified defendant in a lineup. He was indicted on October 18, 2007, while he was in custody on the vehicular hijacking charge.

¶ 8      Defendant went to trial in January 2010, more than 10 years after the offense. The State's principal evidence was the testimony of M.C. and the DNA analysis. Some of the police officers involved in the investigation, and the emergency physician who treated M.C. at West Suburban

Hospital, also testified for the State. Defendant took the stand and asserted an affirmative defense of consent. In particular, he testified that M.C. was a prostitute; that their encounter was silently understood to be a "trick;" and that M.C. got angry with defendant afterward, calling him a "cheap bastard," because he paid her far less than she expected. The jury returned a split verdict, finding him guilty of aggravated criminal sexual assault based on anal penetration, but not guilty based on vaginal penetration.

¶ 9                                    II. The Absent Defense Witnesses

¶ 10    A recurring issue at trial was the absence of four prospective defense witnesses: Officer Mendro, Detective Poli, Peggy Mateski, and Antoine Johnson. The defense anticipated calling these witnesses to impeach M.C. on certain specific points, and more generally to challenge her credibility, which was critically at issue given the crux of defendant's affirmative defense. But for various reasons, the defense was unable to perfect service on any of these witnesses.

¶ 11    Those obstacles were the subject of various defense motions both immediately before and during trial. For example, the defense moved for a continuance (so it could redouble its efforts to serve Johnson), for a rule to show cause (as to why Poli and Mendro did not appear), and for a mistrial (because the defense was both unable to subpoena Mateski, and prejudiced by the denial of the previous motions). In many respects, the details of these motions need not concern us here. What matters, for the issue of pre-indictment delay, is *why* the defense was unable to secure the appearance of these witnesses. On this question, the motions, in sum, revealed the following.

¶ 12                                          A. Antoine Johnson

¶ 13    Johnson was M.C.'s boyfriend when she was sexually assaulted. M.C. was 15 years old at the time; Johnson was in his mid-thirties. The defense argued that Johnson would impeach M.C.'s account of her alleged encounter with defendant a few days before the assault and thus

cast doubt on defendant's alleged motive for the attack.

¶ 14 According to M.C., she was hanging out with Johnson and some other people on a neighborhood corner. Defendant drove by and "tried to talk" to her. When she rebuffed his advances, defendant made some "disrespectful" comments and drove off. Later, during the sexual assault, defendant said to M.C., "I told you I would get you," referring back to their earlier encounter. According to the police reports, Johnson's contemporaneous statements contradicted M.C.'s claims.

¶ 15 But Johnson proved an elusive witness at first, and an unwilling witness later on. In 1999, he told the police that his name was Lamar Jones. Through its own investigation, the State eventually learned Johnson's real name and address in June 2009, and it disclosed that information to the defense in October 2009. Johnson was on parole at the time and living with his mother.

¶ 16 In late December 2009 and early January 2010, an investigator from the public defender's office tried to serve Johnson at least four times. Counsel went too, on at least one occasion. But Johnson was never home.

¶ 17 As the trial was starting, the investigator left a subpoena with Johnson's mother and then managed to reach him on the phone. Johnson told the investigator that he would not appear in court or testify on defendant's behalf, and that he would refuse service of any subpoena.

¶ 18                    B. Officer Mendro and Detective Poli

¶ 19 The defense argued that the police reports written by Officer Mendro and Detective Poli contradicted M.C. on several points. For example, the officers noted that M.C. did not appear to have any scratches, bruises, or other injuries, which tended to contradict her claim that defendant forced her to have sex with him on ground covered with rocks and broken glass, and instead

tended to support defendant's claim that they had consensual sex in his car. The officers could also speak to M.C.'s initial description of the assailant, which did not match defendant in various ways; and to omissions in her initial statements to the police about the assailant's alleged gun.

¶ 20    Eleven days before trial, on December 31, 2009, the defense tried to serve subpoenas for Mendro and Poli on the Chicago Police Department, using the department's normal procedures for accepting agency service on behalf of its officers. Unbeknownst to the defense, Mendro and Poli were retired. (The record does not reveal when they retired.) Thus, they were not served the subpoenas delivered to CPD.

¶ 21    The defense did not discover any of this until the start of the trial. The State knew that the officers had retired, but it had no occasion to share this information earlier because the defense had never indicated that it intended to call the officers. The State noted that there are established procedures for obtaining the forwarding addresses of retired officers for purposes of service, and it offered to help the defense in this task. During the trial, the defense again tried to serve the officers, this time at their homes. Nobody answered at Mendro's house, so a subpoena was left in the door. Another was left with Poli's son, who "refused to sign for it." In the end, the defense never personally served either officer.

¶ 22                                    C. Peggy Mateski

¶ 23    Peggy Mateski was a nurse who treated M.C. at West Suburban Hospital. The defense contended that M.C. made statements to Mateski, namely, about where she was going when she was sexually assaulted, that contradicted her later accounts of the incident.

¶ 24    On the morning of jury selection, the defense tried to serve Mateski at the hospital. As it turned out, she was on maternity leave, having given birth the week before. The hospital declined to give out her home address. Thus, Mateski was never personally served.

¶ 25    When counsel moved for a mistrial on this ground (and others), defendant asked the judge if he could "file right now ineffective assistance of counsel." The judge explained that the allegation would have to await the verdicts, since there was still a possibility that the jury would acquit him, in which case there would be no prejudice.

¶ 26                                III. Post-trial Proceedings

¶ 27    The judge returned to defendant's allegation of ineffective assistance immediately after the verdicts were rendered. Citing *People v. Lawson*, 67 Ill. 2d 449 (1977), our supreme court's controlling authority on the issue of pre-indictment delay, the judge could see "no reason" why a motion to dismiss the indictment should not have been filed. Since July 1990, the judge believed, Illinois law had required anyone convicted of a felony to submit a DNA sample, and defendant had a prior felony conviction within that timeframe; thus, his DNA should have been on CODIS when M.C.'s rectal swab was taken. Yet it took the State more than 6 years to match his DNA to the swab.

¶ 28    The long delay between the 1999 offense and the 2007 indictment thus stood in need of some justification, and defendant's attorneys "made a serious error" in failing to demand one, by moving to dismiss the indictment before trial. On this basis, and without any further preliminary *Krankel* inquiry into defendant's allegation of ineffective assistance, the trial court determined that new post-trial counsel should be appointed.

¶ 29    Before new counsel was appointed, defendant's trial attorneys—taking their cue from the judge—filed a "motion in arrest of judgment." Citing *Lawson*, the motion alleged, among other claims, that the pre-indictment delay deprived defendant of due process, and that the indictment should therefore be dismissed. It does not appear from the record that the trial court ruled on this motion.

¶ 30    New post-trial counsel was eventually appointed and, in due course, filed two motions on defendant's behalf. Both motions raised the issue of pre-indictment delay, albeit in different guises. A motion to dismiss the indictment alleged that the delay impaired defendant's ability to conduct his defense and thus violated due process. Although motions to dismiss are more often filed before trial, the trial court granted leave to file the motion after trial, having stated earlier in the proceedings that it would not "limit" post-trial counsel's options in these circumstances. The second, more typical post-trial motion was a motion for new trial. It alleged that trial counsel was ineffective for failing to move for dismissal in the first instance, based on pre-indictment delay.

¶ 31    In these motions, post-trial counsel clarified that not all of the delay between the offense and the indictment could be charged to the State, as the trial court had supposed. Illinois law had not required a DNA sample to be collected upon conviction for *any* felony offense since 1990; that provision did not take effect until August 22, 2002. See 730 ILCS 5/5-4-3(a)(3.5). The more limited provision in effect before then (which was limited to sex offenders) did not apply to defendant. And defendant did not have any felony convictions between the effective date of the revised provision and his March 30, 2005 conviction for vehicular hijacking. Thus, defendant was not required to submit a DNA sample until March 30, 2005. The delay attributable to the State should begin at that point and run until defendant's eventual indictment on October 18, 2007—still a significant delay, of slightly more than 2 ½ years.

¶ 32    The State argued that it could only be charged with an even shorter delay, of roughly 20 months. Although defendant was convicted on March 30, 2005, his DNA was not entered into CODIS until December 20, 2005, and the Illinois State Police (ISP) did not send a written report of the match to CPD until February 27, 2006. In the State's view, the only delay that counted for a due process analysis was the delay that began once CPD received the written report from ISP.

¶ 33     As for why it took so long to indict defendant—be it a 20- or 30-month delay—the State explained that defendant was in prison, they "knew he wasn't going anywhere," and they "were working on other cases."

¶ 34     On the question of prejudice, post-trial counsel argued that the pre-indictment delay prevented defendant (1) from testifying in greater detail and (2) from being able to call the four missing witnesses—Mendro, Poli, Mateski, and Johnson—to impeach M.C. on the various points already noted.

¶ 35     The trial court found that the relevant delay began when CPD received the DNA report; that the delay was not justified; and that trial counsel's failure to challenge the delay in the first instance was objectively unreasonable. But defendant's claims still failed, principally because he was not prejudiced by the pre-indictment delay. The absence of the prospective witnesses, in the trial court's view, was not sufficiently damaging to the defense, because much of their anticipated testimony would have been either cumulative or limited to collateral issues.

¶ 36     The trial court also found that Johnson's absence was not attributable to the delay in the first place. Rather, Johnson was simply "ducking" the defense investigator and "avoiding" the subpoena. As for the other witnesses, the trial court noted that trial counsel was deficient in another regard—namely, in failing to timely serve subpoenas.

¶ 37     As to the issue of pre-indictment delay, the trial court denied both of the motions filed by post-trial counsel. On direct appeal, counsel did not challenge either of those rulings. As a result, the issue of pre-indictment delay was not raised, either as a due process claim or under the rubric of ineffective assistance of trial counsel. But direct-appeal counsel did raise an overlapping issue: that defendant was denied his right to present a complete defense, because he was unable to call

Johnson or Poli. See *Kirkman*, 2016 IL App (1st) 131475-U, ¶¶ 84-114. We rejected this contention, along with several others, and affirmed defendant's conviction.

¶ 38   In his post-conviction petition, defendant alleged that his direct-appeal counsel was ineffective for failing to "challenge trial court constitutional violations that denied him a fair trial," including the pre-indictment delay. In other words, defendant alleged that direct-appeal counsel failed to challenge the trial court's denial of the motion to dismiss the indictment on due-process grounds. Defendant did not allege that direct-appeal counsel failed to allege ineffective assistance of trial counsel on this basis. Defendant did allege that trial counsel was ineffective on related but distinct grounds, namely for failing to subpoena and call the absent witnesses.

¶ 39   The circuit court dismissed the petition at the first stage. The circuit court's written order addresses several of the issues that defendant raised, but it does not even mention, much less analyze, the issue of pre-indictment delay.

¶ 40                          ANALYSIS

¶ 41   Defendant's postconviction-appellate counsel raises one issue on defendant's behalf: His postconviction petition stated "the arguable basis of a constitutional claim that his [direct-appeal] counsel was ineffective for failing to argue that trial counsel was ineffective for not moving to dismiss the indictments for oppressive pre-indictment delay."

¶ 42   One major problem at the outset: That is not what defendant's postconviction petition alleged. Defendant *did* allege that direct-appeal counsel was ineffective for failing to argue that the pre-indictment delay violated his due-process rights. To repeat, the postconviction petition alleged that "[a]ppellate counsel failed to challenge the trial court constitutional violations that denied Mr. Kirkman a fair trial."

¶ 43    But defendant's postconviction petition does *not* allege that direct-appeal counsel was ineffective for failing to argue *trial counsel's ineffectiveness* in failing to challenge the pre-indictment delay. And for good reason: Trial counsel obviously *did* challenge the pre-indictment delay. Trial counsel filed a motion to dismiss the indictment, post-trial, after being granted leave to do so by the trial court. The motion was fully briefed and extensively argued. It was unsuccessful, of course, but in no way could anyone argue that trial counsel was ineffective for failing to *raise* the issue. Defendant's postconviction petition certainly did not so allege.

¶ 44    In other words, the argument on appeal before us—an ineffectiveness claim within an ineffectiveness claim—is not what defendant alleged in his postconviction petition, nor would it have made sense for defendant to have alleged it. We may not consider issues raised by appellate counsel that were not raised in the postconviction petition below. *People v. Jones*, 213 Ill. 2d 498, 508 (2004).

¶ 45    But we think it is only fair to consider the claim that defendant *did* raise in his postconviction petition—that direct-appeal counsel should have argued that the pre-indictment delay violated defendant's due-process rights or, said differently, that direct-appeal counsel should have argued that the trial court erred in denying defendant's motion to dismiss based on pre-indictment delay. And we find it not only fair but proper to do so, because while there is a difference, of course, between the ineffectiveness argument defendant raised in his postconviction petition and the one briefed on appeal, they are both ineffectiveness claims at their core, and thus they both ultimately rise or fall on the same question—the merits of the underlying pre-indictment-delay argument. As both parties have weighed in extensively on *that* question, we are fully equipped to proceed to its consideration.

¶ 46    A post-conviction petition may be dismissed at the first stage only if it lacks an arguable basis in fact or law. *People v. Brown*, 236 Ill. 2d 175, 185 (2010); see 725 ILCS 5/122-2.1(a)(2) (West 2019). Thus, defendant must show here that direct-appeal counsel failed to raise an arguably meritorious issue of pre-indictment delay. *Brown*, 236 Ill.2d at 185; *Simms*, 192 Ill. 2d at 362. Because we review a summary dismissal *de novo* (*Brown*, 236 Ill. 2d at 184), we may affirm on any basis apparent in the record. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 47    A claim of ineffective assistance of direct-appeal counsel is governed by the familiar *Strickland* standard of deficient performance and prejudice. *Simms*, 192 Ill. 2d at 361; *Evitts v. Lucy*, 469 U.S. 387, 396-97 (1985); see *Strickland v. Washington*, 466 U.S. 668 (1984). To establish prejudice under *Strickland*, defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Simms*, 192 Ill. 2d at 362. If the defendant cannot establish prejudice, his *Strickland* claim fails, even if he can establish deficient performance, as both deficiency and prejudice must be established. *People v. Perry*, 224 Ill. 2d 312, 342 (2007).

¶ 48    A pre-indictment delay may violate due process if it hindered the defendant's ability to defend against the charges and thus deprived the defendant of a fair trial—even if the charges were filed within the statutory limitations period, as they were here. *Lawson*, 67 Ill. 2d at 457; *United States v. Marion*, 404 U.S. 307, 324 (1971). To prevail on such a claim, a defendant must show that the delay in filing charges caused "actual and substantial prejudice" to his ability to defend against them. *Lawson*, 67 Ill. 2d at 459.

¶ 49    The "mere possibility" of prejudice—for example, a defendant's assertion that his memory has faded with the passage of time—is not enough to carry this decidedly difficult burden. *Id.* at 459-60. But the unavailability of a witness, on account of the delay, may be

enough, if the witness's testimony would have been sufficiently favorable to the defense. See, *e.g.*, *United States v. Barket*, 530 F.2d 189, 196 (8th Cir. 1976) (*en banc*) (substantial prejudice where six potential witnesses died during 47-month delay in filing charges).

¶ 50    If the defendant can show actual and substantial prejudice, the burden shifts to the State to show "the reasonableness, if not the necessity, of the delay." *Lawson*, 67 Ill. 2d at 459. If the State offers legitimate reasons for the delay, the court must balance these competing interests. *Id.* If the balance tips in the defendant's favor—or if the delay was not reasonable and justified to begin with—the charges should be dismissed. *Id.* at 456-57; *Marion*, 404 U.S. at 324.

¶ 51    Here, the record refutes any contention that the absence of the four prospective witnesses from defendant's trial was even arguably *caused by*, or attributable to, the delay in charging him, as opposed to other extraneous factors. See *Lawson*, 67 Ill. 2d at 459. Put differently, the record unequivocally shows that there was no "nexus between the delay and the unavailability of the evidence or witnesses." *People v. Lawson*, 38 Ill. App. 3d 239, 241-42 (1976), *reversed on other grounds by Lawson*, 67 Ill. 2d 449.

¶ 52    For this purpose, we can address three of the prospective witnesses—Officer Mendro, Detective Poli, and Nurse Mateski—in one fell swoop. The point, in each instance, is the same: The reason these witnesses did not testify had nothing to do with the time delay and everything to do with trial counsel's failure to diligently (and timely) pursue service of process to secure their attendance at trial.

¶ 53    Defendant's trial began on January 11, 2010. The trial court set that date in September of the previous year. The defense waited until December 31, 2009—eleven days before trial, and in the midst of the winter holidays—to make its first attempt to subpoena Mendro and Poli.

¶ 54    Although more than a decade had passed since these officers were involved in the case (they wrote contemporaneous police reports), trial counsel simply assumed that they were still employed by CPD. Counsel accordingly had subpoenas delivered to police headquarters, on the assumption that such "agency service" would suffice. It was not until the start of the trial that counsel discovered the officers had both retired, and so neither officer had been served. With the State's help, trial counsel located their current addresses and tried again to serve them, in the midst of the trial, but those efforts did not succeed. In the end, the defense never managed to subpoena either officer.

¶ 55    Trial counsel waited even longer to try to serve Mateski, the nurse who treated M.C. at West Suburban Hospital. The defense first attempted to serve Mateski on the morning of jury selection. Counsel had a subpoena delivered to the hospital, where Mateski was still employed. But she had just gone on maternity leave, having given birth the week before, and the hospital declined to give out her home address. Thus, the defense did not manage to serve Mateski, either.

¶ 56    The record thus makes clear that while the defense was unable to procure the testimony of these witnesses, they were not, strictly speaking, "unavailable" at all—much less rendered unavailable by 20- or 30-month delay (depending on how one counts) in charging defendant. Unlike in *Barket*, 530 F.2d at 196, cited here by defendant, in which six prospective witnesses died during a nearly 4-year delay in filing charges, the witnesses here were all alive and well and living locally. The fact that they were all either retired from the police force or on maternity leave did not mean that the defense could not subpoena them to testify; that merely made the process a bit more complicated. The problem, ultimately, was that trial counsel waited until the last minute, and when unexpected complications arose—as they so often do—the defense was unable to perfect service in time.

¶ 57    This is not the first time we have reached essentially the same conclusion. On direct appeal, defendant argued that the trial court's refusal to grant a mid-trial continuance, so that he could keep trying to subpoena Poli, denied him his right to present a complete defense. We rejected that argument, finding, among other things, that the defense's inability to procure Poli's testimony was the result of its own lack of diligence in serving him. *Kirkman*, 2016 IL App (1st) 131475-U, ¶ 93.

¶ 58    The trial court also reached this conclusion in the post-trial proceedings—and not only with respect to Poli, but with respect to all three of these prospective witnesses. The trial court expressly found that trial counsel was deficient for failing to timely serve them. Part of the trial court's point, as we understand it, is that the defense's inability to procure the testimony of these witnesses was not the result of any delay in charging defendant. Thus, it did not support a claim of prejudice caused by pre-indictment delay and did not provide any basis for dismissing the indictment on due-process grounds. On this point, we completely agree with the trial court's assessment.

¶ 59    That leaves Johnson. At the time of the sexual assault, he was in his thirties and dating 15-year-old M.C. Small wonder that he gave the police a false name, later derailing the State's efforts to find him during its pre-trial investigation. Eventually, the State tracked him down and shared his whereabouts with the defense. In late December 2009 and early January 2010, as the trial approached, Johnson was on parole and living with his mother. The defense tried to serve him at least four times. But he was never home.

¶ 60    As the trial was getting underway, a defense investigator finally managed to get Johnson on the phone, after leaving a subpoena with his mother. Johnson told the investigator, in no

uncertain terms, that he wanted nothing to do with this case: He would not appear in court or testify on defendant's behalf, and he would refuse service of any subpoena.

¶ 61    Johnson chose, of his own accord, to make himself unavailable to the defense. Indeed, as we noted in our decision on direct appeal, "[i]t is not surprising" that he "would be uninterested in participating in this trial," given, among other things, that he was a grown man dating a minor at the time of the events in question. *Id.* ¶ 107.

¶ 62    In the same vein, the trial court expressly found that Johnson's unavailability was not attributable to the State's delay in charging defendant, but rather to Johnson's own conduct—namely, that he was "avoiding service" and "ducking" the defense. And, we would add, flatly refusing to testify or otherwise cooperate when the defense eventually tracked him down.

¶ 63    In short, Johnson's unavailability was not caused by any pre-indictment delay, and given his efforts to steer clear of this case from the very beginning, by giving the police a false name, there is simply no reason to think that he would have been of a different mind had the State indicted defendant 20 or even 30 months earlier than it did. Thus, Johnson's unavailability to the defense does not even arguably support a claim of prejudicial pre-indictment delay.

¶ 64    Two final points. First, the parties extensively discuss the question of whether the purported testimony of these witnesses would have been sufficiently favorable to the defense to show that he was prejudiced by the delay. (The trial court did not believe any of these witnesses, save possibly the nurse, would have been much help to defendant at all, given the defense of consent he was raising.) Because defendant's claim fails for a more basic, threshold reason, we have no need to take up those arguments.

¶ 65    Second, in the post-trial proceedings, the parties disputed the length of the pre-indictment delay attributable to the State. The dispute turned, in particular, on whether the delay should be

measured from March 30, 2005, when defendant was first required to submit a DNA sample; or from February 27, 2006, when ISP sent a written report of the CODIS match to CPD. (Nobody suggested December 20, 2005, when the CODIS match was first found.) On appeal, the parties say next to nothing about this dispute, and we need not resolve it to decide this case. Nothing we have said should be taken to imply anything, one way or the other, about when the clock starts to run on a pre-indictment delay in circumstances like these.

¶ 66    Because the pre-indictment delay had no impact on defendant's ability to subpoena the police officers, nurse, and lay witness at issue here, defendant would not have prevailed on this pre-indictment-delay argument on direct appeal. Because there is no probability, much less a "reasonable probability," that "the result of the proceeding would have been different" had this argument been raised on direct appeal, defendant cannot establish the prejudice prong of *Strickland* against direct-appeal counsel. *Simms*, 192 Ill. 2d at 362. The *Strickland* claim fails on that basis alone, and we need not consider the other prong of deficient performance. *Perry*, 224 Ill. 2d at 342.

¶ 67                                    CONCLUSION

¶ 68    For these reasons, we affirm the judgment of the circuit court.

¶ 69    Affirmed.